# United States Court of Appeals
## For the First Circuit

Nos. 21-1150, 21-1230

H.H.,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITIONS FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Lipez, and Howard,
Circuit Judges.

SangYeob Kim, with whom Gilles Bissonnette and American Civil Liberties Union of New Hampshire were on brief, for petitioner.

Kristen A. Giuffreda, Trial Attorney, Office of Immigration Litigation, Civil Division, with whom Brian Boynton, Acting Assistant Attorney General, and Shelley R. Goad, Assistant Director, were on brief, for respondent.

Anna R. Welch, Suzannah Dowling (Student Attorney), and Cumberland Legal Aid Clinic, University of Maine School of Law on brief for amici curiae Immigration Law Professors.

William J. Aceves, California Western School of Law, Nathan P. Warecki, and Nixon Peabody LLP on brief for amici curiae Current and Former U.N. Special Rapporteurs on Torture.

Adam Gershenson, Zachary Sisko, Marc Suskin, Valeria M. Pelet del Toro, Samantha Kirby, and Cooley LLP on brief for amici curiae Former Immigration Judges and Former Members of the Board of Immigration Appeals.

---

October 21, 2022

---

**LIPEZ, <u>Circuit Judge</u>.** Petitioner H.H.[1] seeks review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of his application for deferral of removal to Honduras under the Convention Against Torture ("CAT"). He argues that the immigration judge ("IJ") applied the incorrect legal standard in assessing whether he would more likely than not be tortured with the "consent or acquiescence" of the Honduran government, and that the BIA erred in its review of the IJ's decision. He also argues that the BIA failed to consider whether the Honduran government would likely torture him and whether the MS-13 gang is a de facto government actor. We agree that the agency[2] erred in these respects, and we therefore grant his petition for review, vacate the order of the BIA to the extent it denied him CAT relief as to Honduras, and remand for further proceedings consistent with this opinion.

I.

## A.    Factual Background

H.H. is a citizen of El Salvador and Honduras. He entered the United States without inspection in 2004, when he was 16 years old, and was apprehended and released by Customs and Border Protection shortly after his arrival. Because he was a

---

[1] We refer to H.H. by pseudonym due to the threats on his life underlying this petition for review.

[2] We refer to the BIA and IJ collectively as the "agency."

- 3 -

minor at the time, he was released to the custody of his uncle, who lived in Maryland. He was ordered removed in absentia in April 2004. H.H. does not recall receiving notice of a removal hearing.

While living in Maryland, H.H. became involved with the MS-13 gang. He was arrested for gang-related activity in 2005 and eventually charged with racketeering and robbery. He pleaded guilty to a Racketeer Influenced and Corrupt Organizations Act ("RICO") charge and was sentenced to 15 years' incarceration.

In or around 2006, H.H. began to cooperate with federal authorities who were investigating other MS-13 members. Most prominently, he testified in the prosecution of a high-ranking MS-13 leader who was eventually convicted and sentenced to 60 years' imprisonment. Based on H.H.'s cooperation, MS-13 has authorized its members to kill him, issuing what the parties refer to as a "luz verde" or "green-light" order. Such an order does not expire and permits his execution by any member of MS-13 regardless of the circumstances under which he is identified.

## B. Proceedings before the IJ

H.H. was released from prison in July 2019 and transferred to the custody of Immigration and Customs Enforcement ("ICE") based on the 2004 removal order. Soon thereafter, he successfully moved to reopen his immigration proceedings and to transfer venue to the Boston Immigration Court. H.H. sought deferral of removal under the CAT as to both El Salvador and

Honduras.[3] The IJ held a series of merits hearings in the spring and summer of 2020.

In these proceedings, H.H. testified about his past involvement with MS-13, noting that he was drawn to the gang lifestyle at a young age. He explained that, since he began his cooperation with the government in 2006, he has lived in fear of execution by other MS-13 members. He testified that he had moved through at least seven federal facilities, using aliases to protect his identity, because the luz verde order put him at significant risk of physical harm from other gang-affiliated inmates. During his time in federal custody, MS-13 members were, in fact, sent to kill him. Further, H.H. testified that an active member of MS-13 who knows H.H. and his family and knows that H.H. informed against MS-13 was removed to Honduras in 2010 or 2011 and is actively involved in gang activities in that country. H.H. also noted that members of the rival 18th Street or Sureños gangs might harm him as well, due to his past affiliation with MS-13. The IJ found H.H. to be a credible witness.

The IJ also heard extensive testimony from Drs. Anthony Fontes and Harry Vanden, two professors whom the IJ qualified as experts on country conditions in El Salvador and Honduras. Both

---

[3] The parties agree that H.H. is ineligible for any other relief due to his RICO conviction.

Fontes and Vanden testified about country conditions and the nature of gang activity in those countries.

With respect to Honduras, Fontes explained that, due to widespread corruption, MS-13 and local police forces are often intertwined in several ways. First, he explained that MS-13 had recently "[b]ecome a more respected political actor" due to its large-scale cocaine distribution networks, and that it maintains power and influence in the areas in which it operates in part by performing traditional state functions like neighborhood security.[4] He explained that while this activity began as a way for gangs to fill the vacuum left by unresponsive police forces, their influence has grown to the point that it is now common for MS-13 members to pay police to permit them to operate with impunity. Fontes testified that police, in addition to accepting bribes, "work as surveillance with [MS-13], to try to identify strangers coming in and out; and also will be tasked to get background information on anyone who MS-13 finds suspicious moving through their territory." He opined that, due to these channels of communication and collaboration between the gangs and the police, and due to H.H.'s gang tattoos, H.H. would be readily identified as a former gang member upon his return. Such

---

[4] For example, he noted that in some neighborhoods "[y]ou don't call the police if something happened in that neighborhood. You call MS-13."

identification would place him at risk of grave harm due to the luz verde order.

Fontes also testified that the perception of H.H.'s gang membership would place him at risk of direct harm from law enforcement. He explained that, although the police collaborate with MS-13 in many communities, numerous law enforcement officers have become frustrated by their inability to effectively combat gang activity and have "taken to extrajudicially pursuing and executing suspected gang members." He said that such actions by law enforcement were "shrugged off by the local populaces," and that, if placed directly in harm's way by Honduran police or military, H.H. would not have the protection associated with actual gang membership due to the luz verde order. Fontes concluded that H.H. would therefore be "between a rock and a hard place," because "MS-13 wants to kill him[] and won't give him any support at all" yet he would also be proactively pursued by members of the Honduran police or national security forces.

With respect to El Salvador, Fontes noted that the Salvadoran president had informed law enforcement officers that they would not face consequences for killing gang members, and that the government would not record such deaths. Fontes testified, however, that such "mano dura," or "heavy hand," policies had failed to stymie the influence of MS-13 and that, as

a result, H.H. would face a significant risk of harm from both the Salvadoran government directly and from MS-13 itself.

Vanden's testimony was substantially similar to Fontes's. He opined on the interconnectedness of MS-13 and the Honduran police force. He also noted that H.H. would be readily identified as a gang member -- perhaps due to the communication between gang members and the police -- and would likely be harmed either directly by the government or by gang members who face little accountability for their actions. He agreed that H.H. would likely face grave harm in El Salvador as well, due to the power of gangs and the government's tolerance of extrajudicial killings of suspected gang members.

In August 2020, the IJ issued a written decision granting H.H. deferral of removal to El Salvador but denying relief as to Honduras. The IJ cited to the extensive evidence that the Salvadoran government itself "employs torturous conduct against actual and suspected gang members," and found that the Salvadoran government would also likely consent or acquiesce to torture performed directly by gang members. Regarding Honduras, the IJ found that H.H. had failed to demonstrate that he would more likely than not be "tortured for a proscribed purpose by or at the instigation of the Honduran government." The IJ concluded that the record showed that any harm that H.H. might suffer in Honduras at the hands of the government directly would arise from "poor

governance and lack of sufficient funding," as opposed to the specific intent to harm current or former gang members.

Regarding the government's consent or acquiescence to torture by private actors, the IJ also found that, while the evidence supported a finding that the Honduran government was "aware of how the gangs abuse the power vacuum created by its own funding and governance issues," H.H. had not demonstrated that Honduran officials would be "willfully accepting" of torture by private actors -- i.e., MS-13. The IJ did not, however, make a more specific factual finding about what he believed Honduran officials would likely do in light of their awareness of gang activity, nor did he make a finding regarding the likelihood that H.H. would be harmed by gang members.

## C. Appeal to the BIA

H.H. and the government cross-appealed the IJ's decisions with respect to Honduras and El Salvador, respectively. The BIA dismissed both appeals. Given that the government has not sought review of the BIA's denial of its appeal regarding deferral of removal to El Salvador, we discuss only the BIA's decision dismissing H.H.'s appeal.[5]

---

[5] The BIA dismissed the government's appeal on the basis that there had been no clear error in the IJ's finding that H.H. would more likely than not be murdered or tortured in El Salvador.

- 9 -

H.H. argued to the BIA that the IJ erred in concluding that he was not likely to be tortured by, or with the "consent or acquiescence" of, the Honduran government. He asserted that the IJ had applied the incorrect legal standard in concluding that he had not established that Honduran officials would be "willfully accepting" of his torture, noting that many circuit courts have rejected the "willful acceptance" standard in favor of a "willful blindness" test. Under the latter test, a CAT applicant may demonstrate consent or acquiescence by establishing that government officials would "turn a blind eye to torture" and violate their legal duty to intervene to prevent it, even if actual knowledge of torture is not established. See, e.g., Cruz-Quintanilla v. Whitaker, 914 F.3d 884, 886-87 (4th Cir. 2019) (internal quotation marks omitted).

The BIA found no clear error in the IJ's determination that H.H. had failed to establish that he would more likely than not be tortured with the consent or acquiescence of the Honduran government. However, the BIA did not directly address whether the IJ had applied the wrong legal standard. Instead, it concluded that the IJ's "specific finding that the potential harm [to H.H.] would not be with any consent or acquiescence of the Honduran government . . . is sufficiently comprehensive to incorporate the concept of willful blindness." And it held that H.H. had failed to show clear error in that finding. The BIA also rejected H.H.'s

argument that MS-13 was a de facto government actor.[6]  Finally, the BIA concluded that it was unnecessary to reach H.H.'s argument that he would likely face torture by the Honduran government.  H.H. timely petitioned for review.

**II.**

**A.  Standard of Review**

To establish eligibility for CAT protection, H.H. must demonstrate that he would more likely than not be subject to torture if removed to Honduras.  See Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004).  Relying on BIA precedent, we have defined torture as "(1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim;[7] and (5) not arising from lawful sanctions."

---

[6] The IJ's decision did not expressly address this argument.

[7] While we have often cited this language regarding the "custody and control" of a government official, which derives from Matter of J-E-, 23 I. & N. Dec. 291 (BIA 2002), the regulatory definition of torture requires only that the victim be "in the offender's custody or physical control."  See 8 C.F.R. § 208.18(a)(6) (emphasis added).  In Azanor v. Ashcroft, 364 F.3d 1013, 1019-20 (9th Cir. 2004), the Ninth Circuit held that any requirement that the victim be in government custody or control for a claim based on torture by private actors was contrary to Congress's intent in ratifying the CAT, as well as its implementing regulations.  The Ninth Circuit therefore rejected Matter of J-E- to the extent it imposed a government custody requirement in all cases and held that a petitioner must only establish the custody and control of the offender.  This case does not require us to

Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004) (quoting Matter of J-E-, 23 I. & N. Dec. 291, 297 (BIA 2002)).

An IJ's determination regarding CAT relief is reviewed as a mixed question of law and fact. See DeCarvalho v. Garland, 18 F.4th 66, 73 (1st Cir. 2021). Factual findings as to "whether a person is likely to suffer a particular harm and the role of the foreign government in causing or allowing that harm" are reviewed for clear error, but "whether the government's role renders the harm by or at the instigation of[,] or with the consent or acquiescence of[,] a public official" is a legal question that is reviewed de novo. Id. (internal quotation marks omitted).

When "the BIA adopts and affirms the IJ's ruling but also examines some of the IJ's conclusions, this [c]ourt reviews both the BIA's and IJ's opinions." Sanabria Morales v. Barr, 967 F.3d 15, 19 (1st Cir. 2020) (quoting Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012)).

## B.  Willful Blindness

H.H. argues that the IJ erred by relying on the willful acceptance standard set forth in Matter of S-V-, 22 I. & N. Dec. 1306 (BIA 2000), in the fourth step of the Elien analysis -- the assessment of whether H.H. showed that he would face torture with the "consent or acquiescence" of the Honduran government.  He

decide whether it is appropriate to join the Ninth Circuit on this issue.

- 12 -

further argues that the BIA erred by upholding the IJ's finding despite this legal error. We first address the IJ's use of the willful acceptance standard.

In Matter of S-V-, the BIA announced that, as part of a showing of acquiescence, "the respondent . . . must demonstrate that [the] officials are willfully accepting of the . . . torturous activities." 22 I. & N. Dec. at 1312. H.H. asserts that the proper test is not willful acceptance, however, but whether Honduran officials are likely to exhibit "willful blindness" toward his torture by private actors. See, e.g., Perez-Trujillo v. Garland, 3 F.4th 10, 18 (1st Cir. 2021) ("Acquiescence includes willful blindness."); Khouzam v. Ashcroft, 361 F.3d 161, 171 (2d Cir. 2004) ("[T]orture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it.").

Although we have previously acknowledged that a government's "acquiescence" to torture for purposes of the CAT may include a showing of willful blindness, see, e.g., Perez-Trujillo, 3 F.4th at 18, we have not squarely addressed whether the BIA's decision in Matter of S-V- conflicts with our approval of the "willful blindness" standard. Moreover, our precedent has not been entirely consistent on the showing required to demonstrate acquiescence to torture under the CAT. See Diaz-Garcia v. Holder, 609 F.3d 21, 26 (1st Cir. 2010) (referring to the petitioner's

- 13 -

burden to demonstrate that a government would be "willfully accepting of" torture by guerrillas for CAT purposes). As we shall explain, the "willful acceptance" standard set forth in Matter of S-V- is inconsistent with the text of the CAT, as well as the clear intent of Congress, and is not required to establish acquiescence to torture.

The United Nations unanimously adopted the Convention against Torture in 1984, and then-President Reagan signed the CAT in 1988. See Committee on Foreign Relations, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 2 (1990) ("Senate Report"). President Reagan then transmitted the CAT to the Senate for advice and consent, along with 17 proposed conditions. Id. at 7. Among these was the condition that, to establish a public official's "acquiescence" to torture, the "public official, prior to the activity constituting torture, [must] have knowledge of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." Id. at 15 (emphasis added). The Senate Foreign Relations Committee found that this condition and others "created the impression that the United States was not serious in its commitment to end torture worldwide." Id. at 4. The Senate took no further action at that time.

In 1990, the first Bush administration submitted revised proposed conditions, which included changing the acquiescence

requirement from requiring "knowledge" of the risk of torture to an "awareness" of it. Id. at 2, 4, 9. The Foreign Relations Committee endorsed this change, noting in its report that "[t]he purpose of this condition is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'" Id. at 9. In October 1990, the Senate adopted its resolution of advice and consent, and the United States' CAT obligations were ultimately codified through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"). Pub. L. No. 105-277, div. G., tit. XXII, § 2242(b), 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note).

The FARRA, in turn, directed "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Id. Accordingly, the Immigration and Naturalization Service ("INS")[8] implemented regulations consistent with the Senate Resolution, using the phrase "awareness" instead of "knowledge." Of particular relevance is 8 C.F.R. § 1208.18(a)(7), which states that

---

[8] The functions of the INS have since been transferred to three other agencies: ICE, U.S. Citizenship and Immigration Services ("USCIS"), and Customs and Border Protection ("CBP").

- 15 -

"[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have _awareness_ of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."[9] (Emphasis added).

Thus, that use of "awareness" and that history persuade us that the willful acceptance test set forth in Matter of S-V- conflicts with the clear intent of Congress. Congress endorsed the CAT and adopted the FARRA in the face of an express statement that "acquiescence" for purposes of the Convention includes "both actual knowledge and 'willful blindness.'" Senate Report at 9. The concept of "willful acceptance," however, necessarily includes

---

[9] In December 2020, the Trump administration promulgated a proposed rule to amend 8 C.F.R. § 1208.18. The regulation would have modified 8 C.F.R. § 1208.18(a)(1) and (a)(7) to explicitly include "willful blindness" and elaborate on the definitions of several other terms. See Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274 (Dec. 11, 2020). The enforcement of this rule was enjoined in January 2021. See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec., 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021). To date, the injunction in Pangea has not been lifted nor has the government argued that this now-enjoined rule is enforceable. While the Biden administration promulgated an interim final rule that went into effect on May 31, 2022, and that amends other parts of 8 C.F.R. § 1208.18, see Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078-01 (Mar. 29, 2022), this rule does not include language modifying 8 C.F.R. § 1208.18(a)(1) or (a)(7), nor does it otherwise address the legal standard governing the consent or acquiescence inquiry. We therefore analyze the regulatory language as it existed prior to the promulgation of the now-enjoined rule.

knowledge of the matter one is "accepting," and excludes the concept of willful blindness.

Accordingly, contrary to Matter of S-V-, a showing of willful acceptance is not necessary to establish "acquiescence" to torture under the CAT.  See Succar v. Ashcroft, 394 F.3d 8, 36 (1st Cir. 2005) (declining to defer to a proposed regulation by the Attorney General when it conflicted with the clear intent of Congress).  Our holding is consistent with that of every circuit to address the issue.  See, e.g., Zheng v. Ashcroft, 332 F.3d 1186, 1194 (9th Cir. 2003) ("Congress made its intent clear that actual knowledge, or willful acceptance, is not required for a government to 'acquiesce' to the torture of its citizens."); Silva-Rengifo v. Att'y Gen., 473 F.3d 58, 67 (3d Cir. 2007) ("A brief review of the Convention's implementing legislation confirms that Congress intended that relief under the Convention not be limited to situations where public officials have actual knowledge of torturous activity.").[10]  Hence, the IJ erred by requiring that H.H. demonstrate that the Honduran government would more likely than not be "willfully accepting" of his torture.

---

[10] See also Khouzam, 361 F.3d at 171; Suarez-Valenzuela v. Holder, 714 F.3d 241, 245-47 (4th Cir. 2013); Hakim v. Holder, 628 F.3d 151, 155-57 (5th Cir. 2010); Amir v. Gonzales, 467 F.3d 921, 927 (6th Cir. 2006); Mouawad v. Gonzales, 485 F.3d 405, 413 (8th Cir. 2007); Cruz-Funez v. Gonzales, 406 F.3d 1187, 1192 (10th Cir. 2005).

The BIA, however, glossed over the IJ's error in upholding the denial of Honduras-based CAT relief, citing to the IJ's statement that "any potential harm that may befall [H.H.] in Honduras would result from its substandard conditions or insufficient governance rather than any consent or acquiescence of the Honduran government."[11] The BIA found no "clear error in the specific finding that the potential harm [H.H. would experience] would not be with any consent or acquiescence of the Honduran government," which it characterized as "a finding of fact that is sufficiently comprehensive to incorporate the concept of willful blindness."

In so concluding, the BIA appears to have treated the IJ's statement regarding the lack of "any consent or acquiescence" as a purely factual finding, subject only to deferential clear error review.[12] However, the question of "whether the government's role renders the harm 'by or at the instigation of or with the

---

[11] These "substandard conditions," according to the IJ, included poor funding and understaffing in the criminal justice system, low wages and lack of training in the national police force, and a "culture of corruption" among police leaders.

[12] "To find clear error as to the IJ's findings of fact, the BIA must be 'left with the definite and firm conviction that a mistake has been committed,'" and such findings "may not be overturned simply because the [BIA] would have weighed the evidence differently or decided the facts differently had it been the factfinder." Adeyanju v. Garland, 27 F.4th 25, 33 (1st Cir. 2022) (alteration in original) (quoting Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54878-01, 54889 (Aug. 26, 2002)).

consent or acquiescence of a public official,'" is legal in nature and is subject to de novo review. DeCarvalho, 18 F.4th at 73 (quoting Samayoa Cabrera v. Barr, 939 F.3d 379, 382 (1st Cir. 2019)); see also Myrie v. Att'y Gen., 855 F.3d 509, 517 (3d Cir. 2017) (vacating and remanding when the BIA reviewed only for clear error the legal conclusion that "the government of Panama would not be acquiescent to any torture") (internal quotation marks omitted). The BIA properly applies clear error review to the IJ's probabilistic findings, such as findings of fact about "how public officials will likely act in response to the harm the petitioner fears." Myrie, 855 F.3d at 515. But it must review without deference the question of whether "the likely response from public officials qualifies as acquiescence under the governing regulations." Id.

The BIA therefore erred by failing to apply the proper standard of review to the IJ's findings. See Adeyanju v. Garland, 27 F.4th 25, 45 (1st Cir. 2022) (stating that application of the wrong standard of review is an error of law). For that reason, we remand for de novo review of the question of acquiescence, understanding that a showing of willful blindness suffices to demonstrate an "awareness" of torture under the CAT. See Castañeda-Castillo v. Gonzales, 488 F.3d 17, 22 (1st Cir. 2007) (en banc) ("If the IJ and [BIA] rested their decision upon a misunderstanding of the legal elements of [a claim], the ordinary

- 19 -

remedy is a remand to allow the matter to be considered anew under the proper legal standards.").[13]

## C.    The Awareness and Breach Prongs

In the interest of judicial efficiency in case the issue arises on remand, we offer one further clarification on the role played by the "willful blindness" standard within the regulatory test for acquiescence set forth at 8 C.F.R. § 1208.18(a)(7).  As described above, § 1208.18(a)(7) requires that a public official "have awareness of [torture] and thereafter breach his or her legal duty to prevent such activity."  By its terms, the regulation anticipates a two-part, successive inquiry: An applicant seeking to establish acquiescence must first demonstrate the likelihood of a foreign government's awareness of torture, and then show a likely breach of the government's duty to intervene to prevent the torture.

However, most of the courts that have adopted the willful blindness standard have not consistently distinguished between the "awareness" and "breach of duty" steps.  For example, in describing willful blindness, the Ninth Circuit simply framed the question as "whether public officials 'would turn a blind eye to torture.'" Zheng, 332 F.3d at 1196 (quoting Ontunez-Tursios v. Ashcroft, 303

_____

[13] Although we have identified a legal error, we recognize that the BIA may conclude that it is necessary to remand to the IJ for further factfinding.

F.3d 341, 354-55 (5th Cir. 2002)); see also Suarez-Valenzuela v. Holder, 714 F.3d 241, 246 (4th Cir. 2013) ("[W]illful blindness can satisfy the acquiescence component of [the regulatory test]."). The failure to explicitly address the conjunctive nature of the regulatory language has created some ambiguity about whether establishing acquiescence requires distinct showings of "awareness" and "breach of duty."

At present, the Second Circuit is the only court to have explicitly established, and consistently applied, a two-step inquiry that reflects the language and structure of the regulation. In Khouzam, it held that "torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it." 361 F.3d at 171 (emphasis added).[14]

This approach is well illustrated by the Second Circuit's reasoning and remand in Scarlett v. Barr, 957 F.3d 316 (2d Cir. 2020). In the underlying agency decision in Scarlett, the BIA acknowledged that Jamaican officials had been aware that gang members had threatened to torture the petitioner, a Jamaican police officer. Id. at 325. However, the BIA held that the petitioner could not establish acquiescence because the record

---

[14] Other circuits have at times approvingly cited 8 C.F.R. § 1208.18(a)(7) but have not uniformly and expressly adopted such a two-part formulation for the acquiescence inquiry. See, e.g., Silva-Rengifo, 473 F.3d at 69-70.

included evidence that his superiors had transferred him to another station and later contacted him to provide him with notice of a gang's planned attack on him. Id. at 323, 335. The Second Circuit remanded the case because the BIA had not addressed whether, notwithstanding the government's awareness of this threat and actions taken to warn the petitioner, the police "bore a legal responsibility to do more." Id. at 335. Hence, the court treated the police's awareness of the torture and potential breach of legal duty as distinct elements of the acquiescence inquiry.

We agree with the Second Circuit's approach. A two-step inquiry is clearly supported by the plain language of 8 C.F.R. § 1208.18(a)(7), which refers first to officials' awareness of torture and, second, to whether they "thereafter breach [their] legal duty to prevent such activity." (Emphasis added). The word "thereafter" inescapably conveys that a finding of awareness is a predicate to finding a breach of a duty, and that both findings are necessary to show "acquiescence."

Moreover, with this two-part framework in mind, it is apparent that the concept of willful blindness pertains to the "awareness" prong of the inquiry. As discussed above, Congress replaced the word "knowledge" with "awareness" as a condition of ratifying the CAT, with the specific intent to express that willful blindness toward torture could suffice in lieu of actual knowledge. See Senate Report at 9. Thus, willful blindness involves the

- 22 -

degree to which government officials are aware of activity constituting torture, but not necessarily whether, given such "awareness," a government official's response (or lack thereof) satisfies the duty to intervene to prevent such torture.[15]  Because the agency's decision rested on its incorrect use of the willful acceptance standard, neither the IJ nor BIA explicitly addressed the question of whether Honduran officials would more likely than not "breach [their] legal responsibility to intervene to prevent [torture]."  8 C.F.R. § 1208.18(a)(7).[16]  We leave it to the agency to analyze breach of duty in the first instance, to the extent necessary.[17]  We note, however, that we join the Second Circuit in expressing skepticism that any record evidence of efforts taken by

---

[15] In our discussions of willful blindness in the criminal context, we have similarly described it as relevant to one's degree of awareness of certain facts.  See United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009) ("A willful blindness instruction is appropriate if (1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge.").

[16] We recognize that there may be cases where some of the same facts supporting a finding of willful blindness also support a finding of breach of responsibility, such as evidence of actions that government actors have taken to avoid learning about torture. In holding that § 1208.18(a)(7) sets forth two analytically distinct steps, we do not mean to limit the universe of facts on which the agency may supportably rely in considering either step.

[17] The proposed 2020 amendment to 8 C.F.R. § 1208.18(a)(7) would have provided additional guidance to the agency on this topic.  However, as we have discussed, the enforcement of these amendments has been enjoined.

the foreign government to prevent torture, no matter how minimal, will necessarily be sufficient to preclude the agency from finding that a breach of the duty to intervene is likely to occur. See De La Rosa v. Holder, 598 F.3d 103, 110-11 (2d Cir. 2010).[18] Rather, on remand, the agency's determination about breach of duty, to the extent such a determination is necessary, must be made after carefully weighing all facts in the record.

## III.

H.H. also requests that we remand on the independent basis that the BIA improperly failed to address his arguments that he would likely be tortured "by or at the instigation of" Honduran officials or others acting in an official capacity. 8 C.F.R. § 1208.12(a)(1).[19] These arguments encompassed two distinct theories. First, H.H. argued that he would be tortured directly

---

[18] In De La Rosa, the panel reviewed a BIA decision that it read to suggest that the mere existence of "preventative efforts of some government actors [could] foreclose the possibility of government acquiescence, as a matter of law, under the CAT." Id. at 110. The court expressed "significant doubts" about this premise and remanded the case to the BIA with instructions to issue a precedential opinion regarding "whether, as a matter of law, a government may acquiesce to a person's torture where (1) some officials attempt to prevent that torture (2) while other officials are complicit, and (3) the government is admittedly unable to actually prevent the torture from taking place." Id. at 110-11. The BIA has not yet issued such an opinion.

[19] These arguments differ from the "consent and acquiescence" claim in that they are predicated on the direct involvement of a government official or person acting in an official capacity, as opposed to simply a state actor's awareness of, and response to, the high probability of torture.

by Honduran officials, such as police or military officers. Second, he argued that MS-13 operates with such impunity that it is a de facto state actor.

Regarding the first theory, the IJ found that H.H. had failed to meet his burden to show that he would more likely than not be tortured by Honduran officials. The IJ reasoned that the record only supported "a finding that [such] torture may occur at times in Honduras," as opposed to "a finding that [H.H.] himself is more likely than not to be subjected to torture." The IJ also found, relying on CAT cases addressing prison conditions, that "poor governance and a lack of sufficient funding for government officials" would likely be the cause of any harm, rather than a specific intent to harm H.H. On appeal to the BIA, H.H. argued that the IJ had erred by assuming that actions by corrupt or rogue officers could not be attributable to the state, and by exclusively relying on prison conditions cases that he claims are inapposite to whether police would target him for extrajudicial assassination.

The BIA explicitly declined to reach these arguments, stating in a footnote that because "we discern no clear error in the [IJ's] findings of fact regarding the likelihood of torture inflicted by private actors (gang members) with governmental acquiescence, we do not address whether the [IJ] clearly erred

with respect to whether a public official would inflict or instigate an act of torture."

This statement is puzzling in the context of this case because H.H. set forth two distinct theories for relief, each relying upon different evidence. Under the "by or at the instigation of" theory, the perpetrator of torture is the state itself. See Matter of O-F-A-S-, 28 I. & N. Dec. 35, 37 (2020) (discussing circuit courts' interpretations of the "official capacity" requirement for CAT claims). The "consent or acquiescence" theory of relief focuses on state actors' awareness of, and duty to intervene in, private conduct. 8 C.F.R. § 1208.18(a)(7). H.H.'s distinct theories therefore depend at least in part on different sets of evidence and, thus, the BIA erred by concluding that its resolution of one theory necessarily resolved the other. See Enwonwu v. Gonzales, 438 F.3d 22, 35 (1st Cir. 2006) (remanding when the BIA failed to consider one of the grounds for the IJ's decision).

The agency also failed to meaningfully address H.H.'s alternative theory that MS-13 itself is a de facto state actor. The IJ said nothing about this argument and the BIA summarily rejected it, concluding that such a theory was "unpersuasive" because it "at most, asserts that the Immigration Judge clearly erred in considering the actual government of Honduras to be the only relevant government for purposes of [H.H.'s] claim." The

BIA's statement does not explain why H.H.'s theory was "unpersuasive" and fails to set forth the proper legal test to determine whether MS-13 is a de facto state actor. Moreover, the BIA's assertion that the IJ did not "clearly err[]" suggests that the IJ made a finding about whether MS-13 was a de facto government, when the IJ made no such finding -- indeed, the IJ was silent on this entire theory.

The First Circuit has not yet addressed the legal question of whether gangs can exert such control over a territory that they are considered de facto state actors for CAT purposes. This question hinges on whether the likely activity of MS-13 members amounts to action taken "in an official capacity." See 8 C.F.R. § 1208.18(a)(1) (requiring that torture be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity" (emphasis added)).

In 2020, the Attorney General issued a precedential opinion interpreting the CAT's "official capacity" requirement, holding that the term "official capacity" is subject to the same analysis applicable to actions taken "under color of law" in the § 1983 context. See Matter of O-F-A-S-, 28 I.& N. Dec. at 40 ("[A] public official acts under color of law when he exercise[s] power possessed by virtue of . . . law and made possible only because [he] is clothed with the authority of . . . law." (internal

quotation marks omitted)). We have interpreted the "under color of law" inquiry to be "the functional equivalent of the Fourteenth Amendment's 'state action' requirement." Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 8 (1st Cir. 2015). A private party can be treated as a state actor in rare circumstances falling into three categories: (1) "if the private party assumes a traditional public function when performing the challenged conduct," (2) "if the private party's conduct is coerced or significantly encouraged by the state," and (3) "if the private party and the state have become so intertwined that they were effectively joint participants in the challenged conduct." Id. (internal quotation marks and alterations omitted). In this case, however, the BIA's summary statement did not purport to rely on Matter of O-F-A-S- or any First Circuit precedent regarding the meaning of actions taken "under color of law."

The government asks us to hold that, because the IJ considered all the record evidence, it must have implicitly made a supportable finding that MS-13 was not a de facto state actor, and that the BIA properly found no clear error in this implicit finding. Cf. Rotinsulu v. Mukasey, 515 F.3d 68, 72 (1st Cir. 2008) (acknowledging that the BIA may make implicit subsidiary findings of fact). However, the BIA's cursory treatment of this issue leaves us unable to infer the factual or legal basis for its determination. See id. at 72 n.1. ("[W]e have found the absence

- 28 -

of specific findings problematic in cases in which such a void hampers our ability meaningfully to review the issues raised on judicial review.").[20] We therefore conclude that the agency erred by failing to articulate its reasoning on this issue "with sufficient particularity and clarity" to facilitate appellate review. See Halo v. Gonzales, 419 F.3d 15, 19 (1st Cir. 2005) (quoting Gailius v. INS, 147 F.3d 34, 46 (1st Cir. 1998)).

We are mindful that where the agency "has given reasoned consideration to the petition, and made adequate findings," it does not have to "expressly parse or refute on the record each individual argument or piece of evidence offered by the petitioner." Wei Guang Wang v. BIA, 437 F.3d 270, 275 (2d Cir. 2006) (internal quotation marks omitted). However, because the IJ provided no explanation at all for dismissing the claim at issue, and because the BIA likewise did not provide any rationale for doing so, remand is necessary. See Enwonwu, 438 F.3d at 35 (remanding where the BIA provided only one general reason for rejecting a claim and noting that the agency "is obligated to offer

_____

[20] The BIA also erred to the extent its reference to "clear[] err[or]" suggested that the de facto government issue presented a purely factual question. The question of whether the IJ's findings of fact meet the definition of "official capacity" as set forth in § 1208.18(a)(1) requires a legal judgment about the meaning of the phrase "official capacity," which the BIA must review de novo. See DeCarvalho, 18 F.4th at 73 (noting that the BIA reviews de novo the IJ's application of the law such as regulatory definitions to its factual findings).

more explanation when the record suggests strong arguments for the petitioner that the [agency] has not considered" (alteration in original) (internal quotation marks omitted)).

**IV.**

For the reasons detailed above, we conclude that the BIA erred by: (1) applying the incorrect standard of review to uphold the IJ's denial of CAT relief as to Honduras, in a misguided effort to accommodate the IJ's error of law in requiring a showing of willful acceptance rather than willful blindness; (2) improperly failing to address H.H.'s argument that he would likely be tortured by or at the instigation of Honduran officials; and (3) failing to meaningfully address H.H.'s argument that MS-13 members may act under color of law.[21]  Accordingly, we grant the petition for review, vacate the BIA's decision insofar as it denied H.H. deferral of removal to Honduras, and remand the case for further proceedings consistent with this opinion.

So ordered.

---

[21] These legal errors provide a sufficient basis for remand. Thus, we do not reach H.H.'s arguments that the BIA also failed to consider whether he could safely relocate within Honduras or that it failed to aggregate all potential sources of torture.  On remand, the agency must adhere to its regulatory obligations under 8 C.F.R. § 1208.16(c)(3) (requiring consideration of all evidence relevant to the possibility of future torture, including the possibility of internal relocation).