# United States Court of Appeals
# For the First Circuit

No. 24-1412

RASHEED AKINSANYA,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Montecalvo, Howard, and Aframe,
Circuit Judges.

Benjamin Osorio, with whom Alaina Taylor and Murray Osorio PPLC, were on brief, for petitioner.

Liza S. Murcia, Attorney, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, and Anthony C. Payne, Assistant Director, Office of Immigration Litigation, United States Department of Justice, were on brief, for respondent.

SangYeob Kim, with whom Gilles Bissonnette was on brief, for American Civil Liberties Union of New Hampshire, amicus curiae.

January 10, 2025

**AFRAME**, **Circuit Judge**. Rasheed Akinsanya is a Nigerian citizen. He has brought a petition for review challenging the administrative denial of his application for deferral of removal pursuant to the regulations implementing the Convention Against Torture ("CAT"). Akinsanya contends that if he were to return to Nigeria, he would be tortured by a terrorist organization called Boko Haram. The Board of Immigration Appeals ("BIA") affirmed the conclusions of the Immigration Judge ("IJ") that Akinsanya could not obtain deferral of removal under the CAT because he failed to demonstrate that Nigerian officials would acquiesce to his potential torture. In evaluating Akinsanya's claim, the BIA did not correctly apply the appropriate legal test for acquiescence. We therefore grant the petition and remand for further proceedings.

**I.**

Before entering the United States, Akinsanya served in the Special Anti-Robbery Squad ("SARS") of the Nigeria Police Force. In 2013, the Nigerian government investigated Akinsanya's SARS unit for a host of allegations including corruption, nepotism, abuse of power, and providing material support to Boko Haram, a terrorist group present in Nigeria.[1] Akinsanya cooperated in the investigation, which culminated in the arrest of several officers, including a deputy commissioner.

---

[1] The IJ describes Boko Haram as an "insurgent group operating and expanding out of the Northeast region of Nigeria with aspirations to replace Nigeria's secular state structure with an Islamic state." Since 2009, Boko Haram has caused more than forty thousand deaths in Nigeria.

Following the investigation, the government reassigned Akinsanya to a different police unit in the northern region of Nigeria. This new unit was focused on combatting kidnapping and human trafficking by Boko Haram. Meanwhile, Akinsanya began receiving anonymous telephone calls and texts that caused him concern for his safety.

In October 2013, Akinsanya entered the United States on a B-1 visa to attend a police conference. The visa authorized Akinsanya to remain in the country until April 2014. While in the United States, Akinsanya learned that one or more people had broken into his house. They took his laptop, vandalized a file cabinet, removed a confidential file identifying Boko Haram informants, and left a threatening letter. Akinsanya also learned that Boko Haram had attacked his new division and caused the deaths of eight officers, including two who had been reassigned with him.

After these events, Akinsanya decided to remain in the United States beyond the expiration of his visa. He testified that he made this decision because he feared that Boko Haram would murder him if he returned to Nigeria.

In the ensuing years, Akinsanya discovered that several other officers involved in the 2013 investigation of his SARS unit had died under suspicious circumstances or been forced to retire from the police force. Then, on two occasions in 2021, members of Akinsanya's family in Nigeria were attacked by individuals looking for Akinsanya.

In early 2021, Akinsanya's ex-wife and daughters were beaten and subsequently hospitalized. During the attack, the individuals interrogated the family about Akinsanya's whereabouts. His ex-wife

informed the intruders that he was in the United States and that they had divorced six years earlier. The police investigated the incident. Akinsanya believes the attackers were associated with Boko Haram.

Later in 2021, Akinsanya's sister, Toyin Olufunke Oladunjoye, was attacked at home by at least three disguised individuals. During the attack, the individuals inquired into Akinsanya's whereabouts and stated that they would kill him if he ever were to return. Before leaving, the attackers shot Akinsanya's sister. She survived the attack but was hospitalized for several days during which time the police interviewed her. She testified that she stopped inquiring about the investigation after the police demanded payment each time she visited the station. She believes that the attackers were affiliated with Boko Haram based on their dialect.

On May 29, 2018, about five years after arriving in the United States, Akinsanya was convicted of conspiracy to commit wire fraud, under 18 U.S.C. §§ 1343 and 1349, and aggravated identify theft, under 18 U.S.C. § 1028A(a)(1)-(2), in the United States District Court for the Southern District of Texas. He received an eighty-seven-month prison sentence.

While Akinsanya was serving his sentence, the government identified him as a removable noncitizen. In April 2023, after Akinsanya completed his sentence, the Bureau of Prisons transferred him to the custody of the Department of Homeland Security ("DHS") for removal proceedings. DHS charged Akinsanya as removable for remaining in the United States longer than permitted and for his aggravated felony conviction.

On June 13, 2023, Akinsanya filed an application for asylum, withholding of removal, and deferral of removal under the CAT. The IJ held several hearings during which he heard testimony from Akinsanya; his friend, Taju Okeleye; his sister, Toyin Olufunke Oladunjoye; and his expert witness, Dr. Godwin Onuoha.

Following the hearings, the IJ issued a written decision. The IJ found that Akinsanya and his witnesses were credible and that Akinsanya's expert was qualified. The IJ determined that Akinsanya was removable from the United States for staying beyond his visa expiration and because of his aggravated felony conviction. The IJ then concluded that Akinsanya was statutorily barred from obtaining asylum and withholding of removal because of his conviction for a particularly serious crime.

Having rejected Akinsanya's requests for asylum and withholding of removal, the IJ turned to his request for deferral of removal under the CAT. The IJ concluded that Akinsanya was ineligible for deferral of removal because he had failed to establish that he would be tortured upon returning to Nigeria by or with the acquiescence of a public official.

The IJ began its CAT analysis with a detailed review of the relevant testimony and evidence. He acknowledged that Nigeria is subject to threats from multiple armed groups, including Boko Haram. He also noted that Nigeria's government is constrained in its ability to protect its citizens, that the police are under-resourced, and that weak institutions and corruption have allowed Boko Haram to "gain a foothold and continue its operations." Regarding Akinsanya directly, the IJ noted

the expert's testimony that he "'may be exposed to the possibility of being killed, if returned to Nigeria' in view of [his] past experiences and the Nigerian government's overall difficulty reining in Boko Haram."

The IJ nevertheless concluded that Akinsanya was ineligible for CAT relief because the "evidence . . . d[id] not support a finding that the Nigerian government or a public official would acquiesce or turn a blind eye to [his] torture." In support of this conclusion, the IJ cataloged a series of actions taken by the Nigerian government to combat Boko Haram: designating Boko Haram a terrorist organization; criminalizing membership and arresting individuals affiliated with the group; engaging in counterterrorism efforts and joint military exercises with other nations; investigating officers in the SARS unit for providing Boko Haram with material support; and infiltrating Boko Haram, as demonstrated by the list of confidential informants stolen from Akinsanya's home. The IJ also noted that the police responded to the 2013 break-in at Akinsanya's home and the 2021 attacks on his ex-wife and sister.

The IJ acknowledged that "these efforts may not be entirely effective" and that "the Nigerian government certainly faces an uphill battle against Boko Haram." The IJ further acknowledged that "torture may occur at times in Nigeria," and Akinsanya may have difficulty avoiding harm from Boko Haram. Despite this, the IJ rejected Akinsanya's claim for CAT protection, concluding that acquiescence cannot be based on the government's "general ineffectiveness" in "prevent[ing] widespread violence and crime affecting the population at large."

Akinsanya appealed to the BIA only the denial of his application for deferral of removal under the CAT. The BIA affirmed. It acknowledged that Nigerian officials may lack the ability to protect Akinsanya but endorsed the IJ's view that an acquiescence finding cannot rest on that basis. The BIA determined that, despite the possibility for violence, Akinsanya's claim failed because Nigerian authorities were taking some preventative measures to combat Boko Haram and the potential ineffectiveness of those measures was not a sufficient ground to establish government acquiescence.

Akinsanya petitioned this Court for review of the BIA's ruling.

## II.

When considering petitions for review of BIA rulings, we generally focus on the BIA's final decision. Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020). To the extent "the BIA has adopted and affirmed the IJ's ruling, but has included discussion of some of the IJ's bases for decision, we review both the IJ's and BIA's opinions." Bonnet v. Garland, 20 F.4th 80, 84 (1st Cir. 2021) (quoting Chanthou Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008)). When discussing the BIA and IJ as a unit, we refer to them together as "the agency." Khalil v. Garland, 97 F.4th 54, 61 (1st Cir. 2024). We review factual findings under the substantial-evidence standard to determine whether "the record compels a conclusion contrary to the one reached by the agency." DeCarvalho v. Garland, 18 F.4th 66, 74 (1st Cir. 2021). We review legal conclusions de novo. Murillo Morocho v. Garland, 80 F.4th 61, 65 (1st Cir. 2023).

- 7 -

Akinsanya's primary claim, and our basis for resolving this petition, is that the BIA did not adequately analyze whether the Nigerian authorities would likely acquiesce in Akinsanya's torture.  We begin our discussion by describing the requirements for obtaining deferral of removal under the CAT regulations with a particular focus on the standard for proving government acquiescence.

To prove eligibility for deferral of removal under the CAT, a petitioner must establish "that it is more likely than not that he will be tortured if returned to his home country."  Bonnet, 20 F.4th at 84 (quoting Mazariegos v. Lynch, 790 F.3d 280, 287 (1st Cir. 2015)); 8 C.F.R. § 208.16(c)(2) (2022).  "[T]orture is defined as 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity.'"  Bazile v. Garland, 76 F.4th 5, 14 (1st Cir. 2023) (second alteration in original) (quoting 8 C.F.R. § 1208.18(a)(1) (2022)).

This Court has articulated a "two-part, successive inquiry" to determine whether a public official acquiesced to torture inflicted by a private actor.  H.H. v. Garland, 52 F.4th 8, 19 (1st Cir. 2022); see also Murillo Morocho, 80 F.4th at 67; Khalil, 97 F.4th at 67; Morgan v. Garland, 120 F.4th 913, 930 (1st Cir. 2024).  "[A]n applicant . . . must first demonstrate the likelihood of a foreign government's awareness of torture, and then show a likely breach of the government's duty to intervene to prevent the torture."  H.H., 52 F.4th at 19-20.   In

discussing the duty to intervene prong, this Court has articulated several considerations that bear on the pending petition:

- Applying the duty to intervene requires the agency to identify the nature of the legal duty that the government owes under the circumstances and then consider whether the steps (if any) taken by government officials satisfy that duty. See Murillo Morocho, 80 F.4th at 68; Khalil, 97 F.4th at 68-69.

- This Court has "express[ed] skepticism that any record evidence of efforts taken by the foreign government to prevent torture . . . will necessarily be sufficient to preclude the agency from finding that a breach of the duty to intervene is likely to occur." H.H., 52 F.4th at 21.

- The duty to intervene inquiry is especially important where the record "suggest[s] that the government's steps have been inadequate and ineffectual." Murillo Morocho, 80 F.4th at 68. The agency must explain why the government's steps, though inadequate or ineffectual, nevertheless satisfy its duty to intervene. Id.

- The agency may only determine whether an applicant has established a breach of the duty to intervene "after carefully weighing all facts in the record." H.H., 52 F.4th at 21.

Guided by these considerations, we conclude that the agency incorrectly analyzed whether Akinsanya proved government acquiescence in his torture. We therefore remand. See Khalil, 97 F.4th at 70 (remanding

where the BIA's acquiescence analysis "[did] not indicate it applied the correct legal test"); Murillo Morocho, 80 F.4th at 68 (same).

**A.**

The BIA's legal analysis of Akinsanya's CAT claim began with a general statement that Akinsanya was required to show, first, that it is "more likely than not that [he] will be tortured upon return to [his] homeland; and second, [that there is] sufficient state action involved in that torture," which includes acquiescence by a public official. The BIA then asserted that a government's inability to protect its citizens does not amount to acquiescence. Relying on that proposition, the BIA affirmed the IJ's no-acquiescence finding, writing that "[p]otential instances of violence committed by non-governmental actors against citizens, together with speculation that the police or government might not prevent that violence, are generally insufficient to prove government acquiescence."

On its face, the BIA's ruling does not appear to apply the correct legal standard for acquiescence. The BIA did not state the two-step acquiescence inquiry; nor did it cite any of this Court's relevant cases.[2] The decision also failed to discuss both prongs of the

---

[2]     The BIA cited two First Circuit cases. It first cited H.H., 52 F.4th 8, which, as we note above, does set out the correct legal standard. But the BIA cited H.H. only for the different proposition that an IJ is not required to "accept all the testimony and opinions provided as facts." The BIA also cited Morales-Morales v. Sessions, 857 F.3d 130 (1st Cir. 2017). That case was decided before H.H. articulated the two-step acquiescence inquiry and rejected the CAT claim summarily. See 857 F.3d at 136 (concluding that "[petitioner's] application for protection under the CAT . . . fails for substantially the same reason as do his challenges to the denials of his request for asylum and withholding of removal").

inquiry.  Specifically, the BIA did not identify the legal duty that the Nigerian government owed to Akinsanya.  See Murillo Morocho, 80 F.4th at 68 (remanding in part due to the agency's failure to address the government's legal duty); Khalil, 97 F.4th at 70 (same).

The government acknowledges these omissions but contends that, "although [the BIA did] not parse the two-prong acquiescence inquiry, [its] path may reasonably be discerned."  We disagree.

The BIA based its no-acquiescence finding principally on the proposition that a government's inability to protect its citizens does not amount to acquiescence and that the Nigerian authorities have been taking some steps to combat Boko Haram.  But this approach, seemingly derived from Fifth Circuit authorities, is inconsistent with this Court's treatment of public-official acquiescence.[3]  A no-acquiescence finding cannot rest solely on the fact that the government has taken some responsive action to combat private violence.

For starters, such reasoning is hard to reconcile with our previously "express[ed] skepticism that any record evidence of efforts taken by the foreign government to prevent torture . . . will necessarily be sufficient to preclude the agency from finding that a breach of the duty to intervene is likely to occur."  H.H., 52 F.4th at 21.

---

[3]  Akinsanya, supported by the American Civil Liberties Union of New Hampshire as amicus curiae, argues that the BIA erred by citing Fifth Circuit authorities because this case was governed by First Circuit law. The government contends that the BIA applied First Circuit law, while also relying "on persuasive case law from the Fifth Circuit" to support its analysis.  Of course, the BIA may rely on persuasive authority from other courts so long as the authority cited aligns with the governing law.  The problem here is that the BIA's understanding of Fifth Circuit caselaw led it afield from the acquiescence inquiry required by this Court in H.H., Murillo Morocho, and Khalil.

- 11 -

More to the point, looking only to whether a government takes some responsive action to prevent private violence fails to account for instances where a foreign government takes some measures but still does not satisfy its legal duty to intervene. Sometimes, despite having taken some action, a government may still have "a legal responsibility to do more." H.H., 52 F.4th at 20 (quoting Scarlett v. Barr, 957 F.3d 316, 335 (2d Cir. 2020)). That is why we require the agency to address whether the government's actions demonstrate that it will adequately meet its legal responsibility to intervene. See id. at 20-21. Addressing this part of the inquiry is especially important where a government's preventative actions have been ineffective. As we have explained, although "'concerns about . . . the overall effectiveness of [] law enforcement efforts do not compel the conclusion' of [public-official] acquiescence," Morgan, 120 F.4th at 931 (quoting DeCarvalho, 18 F.4th at 75); see also Urias-Orellana v. Garland, 121 F.4th 327, 338-39 (1st Cir. 2024) (same), such concerns remain pertinent to whether a government is likely to meet its legal duty to intervene, see Murillo Morocho, 80 F.4th at 68 (explaining that an evaluation of a government's efforts in light of the government's legal duty is particularly important where "the record suggest[s] that the government's steps have been inadequate and ineffectual").

Here, the BIA acknowledged evidence that "the Nigerian government is actively combating numerous terrorist groups and rebels throughout the country, including Boko Haram," and the possibility that such efforts may be ineffective. The BIA did not, however, articulate the Nigerian government's duty to protect Akinsanya, one of its law

- 12 -

enforcement officers, from Boko Haram's violent retaliation. Nor did the BIA explain whether, in this situation, the fact that the "Nigerian government is actively combating numerous terrorist groups and rebels" was sufficient to establish a likelihood that Nigerian officials would satisfy their legal duty to intervene.

By resting its decision solely on the fact that the Nigerian government has taken some responsive actions to combat Boko Haram but neglecting to analyze whether those actions satisfy the duty to intervene, the BIA failed to correctly perform the acquiescence inquiry.[4] Accordingly, we remand for the BIA to address "what 'legal duty' [governmental] authorities [owe] in this situation and whether the

---

[4] Akinsanya separately contends that, in crediting the Nigerian government's country-wide efforts to combat Boko Haram when evaluating acquiescence, the agency imposed on Akinsanya an "improperly high burden" to establish acquiescence. The agency, he argues, effectively required him to prove that "the entire Nigerian government," and not just "'a' public official," would acquiesce in his torture.

As we are remanding in any event, we do not reach this argument. But we offer two observations. First, the agency did not consider only country-wide efforts to combat Boko Haram; the IJ described efforts by the police that were specific to Akinsanya and his family. Second, general governmental efforts to address violence are relevant, but not necessarily dispositive, considerations when evaluating government acquiescence. See, e.g., Ruiz-Guerrero v. Whitaker, 910 F.3d 572, 575 (1st Cir. 2018)(crediting a country report detailing several government agencies and policies designed to combat violence against women); Perez-Trujillo v. Garland, 3 F.4th 10, 21 (1st Cir. 2021)(crediting general governmental efforts to address gang violence); Khalil, 97 F.4th at 69 (stating that "'the fact that some officials take action to prevent the torture' is 'neither inconsistent with a finding of government acquiescence nor necessarily responsive to the question of whether torture would be "inflicted . . . with the consent or acquiescence of a public official"'" (alteration in original) (quoting De La Rosa v. Holder, 598 F.3d 103, 110 (2d Cir. 2010))).

government's efforts satisf[y]" that duty.[5]  Murillo Morocho, 80 F.4th at 68.

**B.**

The government alternatively argues that, even if the BIA committed legal error when considering acquiescence, we may still affirm because BIA and IJ decisions are sometimes read as a unit, and here, the IJ correctly applied the acquiescence inquiry.  We disagree for three reasons.

First, the IJ's role is to perform only an initial assessment of the petitioner's claim.  See 8 U.S.C. § 1229a(a)(1); 8 C.F.R. § 1003.10(b) (2024); DeCarvalho, 18 F.4th at 73.  The BIA then reviews findings of fact for clear error and legal conclusions and questions of discretion and judgment de novo.  8 C.F.R. § 1003.1(d)(3)(i)-(ii) (2024); DeCarvalho, 18 F.4th at 73.  Specifically, the BIA reviews de novo the IJ's application of facts to determine whether a public official's response to potential torture establishes that the official "breach[ed] his or her 'legal responsibility to intervene to prevent such'" torture.

---

[5]  Akinsanya also asks this Court to further define what constitutes a public official's legal duty to intervene.  Specifically, he requests that this Court direct the BIA to apply a "due diligence" standard borrowed from the United Nations Committee Against Torture's General Comment No. 2.  See U.N. Comm. Against Torture, Gen. Comment No. 2, Implementation of Article 2 by States Parties, U.N. Doc. CAT/C/GC/2, at ¶ 18 (Jan. 24, 2008).  We decline that request.  "Our task is to review the agency's legal interpretation, not perform it in the first instance."  Tillery v. Lynch, 821 F.3d 182, 186 (1st Cir. 2016); see also Negusie v. Holder, 555 U.S. 511, 517 (2009); Guta-Tolossa v. Holder, 674 F.3d 57, 61 (1st Cir. 2012).  We leave it to the BIA, in the first instance, to define the legal duty to intervene.

Khalil, 97 F.4th at 67 (alteration in original) (quoting Myrie v. Att'y Gen., 855 F.3d 509, 517 (3d Cir. 2017)).

Retreating to the IJ's no-acquiescence conclusion where the BIA introduces legal error by not properly applying a legal standard deprives a petitioner of meaningful de novo review by the BIA. That is no small thing. The BIA's de novo review of an IJ's no-acquiescence determination presents a substantial opportunity for the petitioner to reverse that determination. See 8 C.F.R. § 1003.1(d)(1) (2024); see also Tillery, 821 F.3d at 185 (noting the BIA has "broad authority to exercise independent judgment and to rest on an alternative basis [to the IJ] when denying a petition"). But the BIA's de novo review is meaningless if it incorrectly applies the legal standard. When that occurs, we must remand so that the petitioner may obtain meaningful BIA review. See, e.g., Khalil, 97 F.4th at 70 (remanding where the BIA's acquiescence analysis "[did] not indicate it applied the correct legal test").

Second, even were we to consider the IJ's no-acquiescence conclusion directly, we still would deem it inadequate. Unlike the BIA, the IJ correctly stated the two-pronged acquiescence standard. The IJ then reviewed the relevant testimony and evidence. It described the steps being taken by the Nigerian government to combat Boko Haram, including efforts specific to Akinsanya. The IJ acknowledged that such efforts "may not be entirely effective" but nonetheless rejected Akinsanya's acquiescence claim on the ground that "[a] general ineffectiveness on the government's part to prevent widespread violence

and crime affecting the population at large does not suffice to show acquiescence such that protection under the CAT is warranted."

The IJ's acquiescence analysis is insufficient. Merely stating the proper standard does not discharge the obligation to correctly apply the standard. See Khalil, 97 F.4th at 68-69, 70 (remanding for the BIA to evaluate acquiescence de novo despite both the BIA and IJ having cited the correct legal standard). Here, the IJ acknowledged expert testimony that Akinsanya may face violence from Boko Haram and listed potentially ineffective efforts by the Nigerian government to protect him. However, as we have already explained, to base a no-acquiescence finding on these ineffective efforts, the IJ also had to define the government's legal duty to intervene and explain why the government's actions establish a likelihood that it would discharge its duty. See Murillo Morocho, 80 F.4th at 68. That critical aspect of the inquiry is missing. See Khalil, 97 F.4th at 69 (remanding where the BIA and the IJ failed to "evaluate[] the effectiveness of those steps and whether they met the government's duty to intervene" (quoting Murillo Morocho, 80 F.4th at 68)).

Finally, the IJ appears to have made its no-acquiescence determination without "carefully weighing all facts in the record." H.H., 52 F.4th at 21. Akinsanya's expert testified that Boko Haram had infiltrated various levels of the Nigerian government, citing ties between the terror organization and a Nigerian vice president, a government minister, and a senator. The record also indicates that members of Akinsanya's initial police division, the SARS unit, were investigated in part for providing material support to Boko Haram.

Evidence of such infiltration could be pertinent to the acquiescence inquiry, but none of this evidence was discussed by the IJ in its findings of fact or legal analysis. By not addressing even the possibility that Boko Haram had infiltrated the Nigerian government, the agency failed to satisfy its obligation to weigh all the facts.[6] See id.

For the reasons discussed, we cannot conclude that the agency correctly applied the legal test for acquiescence. We therefore must remand so that the agency can give Akinsanya's CAT claim "reasoned consideration."[7] H.H., 52 F.4th at 23 (quoting Wang v. BIA, 437 F.3d 270, 275 (2d Cir. 2006)); Murillo Morocho, 80 F.4th at 68.

---

[6] The government contends that some of the infiltration evidence presented by Akinsanya's expert was undermined on cross-examination. Because there is no mention of this evidence in the IJ's decision, we cannot determine whether the IJ concluded that there was no infiltration as a matter of fact, whether it simply overlooked the infiltration evidence presented, or whether it deemed the evidence irrelevant to the inquiry.

[7] Akinsanya makes two alternative arguments. First, he contends that the agency, in denying his claim, erred by considering only whether the Nigerian government would acquiesce in his torture and not the necessary antecedent -- whether Akinsanya would in fact be tortured. But a petitioner's inability to satisfy any prong of the legal test for CAT protection is dispositive. See Murillo Morocho, 80 F.4th at 66. The agency need not reach a second prong where the first will suffice. Id. If the agency decides on remand to grant relief, it will have to determine that Akinsanya has satisfied all aspects of the torture inquiry.

Akinsanya relatedly argues that this Court must remand as the "uncontroverted record evidence compels a finding that [he] would suffer death if returned to Nigeria," and "the IJ and the BIA failed to explain why they did not find in accordance with the expert's testimony." As we are remanding for reconsideration of the acquiescence question, we leave it for the agency to decide, in the first instance, whether Akinsanya proved he would experience torture if he were to return to Nigeria.

**IV.**

We **grant** Akinsanya's petition for review, **vacate** the agency's decision, and **remand** to the BIA for further proceedings consistent with this opinion.