Not for Publication in West's Federal Reporter

# United States Court of Appeals
## For the First Circuit

No. 07-1851

ABDOU ABDEL MALEK and AMAL NASR SAMAAN,

Petitioners,

v.

MICHAEL B. MUKASEY,[*]
ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Howard, Circuit Judge,
Stahl, Senior Circuit Judge,
and Besosa, District Judge.[**]

Saher J. Macarius on brief for petitioner.
Drew C. Brinkman, Attorney, Office of Immigration
Litigation, Jeffrey S. Bucholtz, Assistant Attorney General, and
Francis W. Fraser on brief for respondent.

April 14, 2008

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Michael B. Mukasey has been substituted for former Attorney General
Alberto R. Gonzales as the respondent.

[**]Of the District of Puerto Rico, sitting by designation.

**STAHL**, **Senior Circuit Judge**.  The Board of Immigration Appeals (BIA) affirmed, per curiam, an Immigration Judge's (IJ's) denial of Abdou Wehba Abdel Malek's[1] claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  Malek, a native and citizen of Egypt, now petitions this court for a review of the BIA's denial of his claims.  We affirm.

## I.  BACKGROUND

The IJ found Malek credible.  Therefore, we relate the facts of the case as he testified to them.

Malek legally entered the United States on January 30, 2000, on a nonimmigrant visa with authorization to remain until July 29, 2000.  On July 31, 2000, Malek timely applied for asylum, withholding of removal, and protection under the CAT.  On January 22, 2004, the Department of Homeland Security commenced removal proceedings against Malek.  In response, Malek admitted the allegations and conceded removability as charged but argued that he is entitled to relief in the form of asylum, withholding of removal, and protection under the CAT.

Malek, a Coptic Orthodox Christian, resided in the town of Port Said, Egypt.  Along with one of his brothers-in-law, Maurice Aziz Abdel Malek, he owned and operated a business related

---

[1]Malek's wife, Amal Nasr Samaan, a native and citizen of Egypt, is a derivative applicant for asylum, withholding of removal, and protection under the Convention Against Torture, based on Malek's application.

to the import and export of used automobile parts. Another brother-in-law, Gamel Wehba Guirgis Atteah, worked as an employee. The license that authorized Malek to operate his business restricted its operations to Port Said, a free trade zone. In March 1991, five men--two of whom, Nabil Mohamed Sharan and Mohamed Atwan, Malek knew from his business affairs--came to Malek's workplace, ostensibly to discuss business with Malek. Soon, however, the ostensible businessmen, particularly an individual named Radab Abu Abir, embarked on an extended discourse proposing that Malek convert to Islam. When Malek indicated his reluctance to do so, the men became "very angry" and extolled the propriety of forced conversion.

Later that month, Sharan and Atwan, this time accompanied by Sheik Mohamed Abu Abir, returned to Malek's workplace to proselytize. This time, Sheik Abir, Sharan, and Atwan firmly ordered Malek to convert to Islam. As an incentive, they promised to provide Malek with money and business assistance if he converted. The men chided Malek that Christianity is a not a "true religion" and that Islam is the only true religion. Malek, angered by their insulting and intolerant behavior, attempted to throw his unwanted guests out of his office. They proceeded to denounce him as a "kafir," which apparently means a particularly bad kind of infidel, against whom any action is justified. Malek interpreted the use of this word as a death threat.

On April 11, Malek received a call from his sister, who was hysterical. She indicated that her husband, Atteah, had converted to Islam. Atteah had purportedly proceeded to instruct her to convert to Islam as well, and informed her that their children were now Muslim by default. She fled to her parents' house, where Malek apparently lived as well. The same day, Malek received another call, this time from Nabil Shaber, one of the Muslim businessmen who had visited him in March. Shaber congratulated Malek on Atteah's conversion, and urged Malek to reconsider his prior refusals.

With the assistance of Father Raphael, a local priest, Malek endeavored to relocate his sister and her children to Tonton, a nearby town. From there, Father Raphael helped them escape to the nation of Jordan. On June 25, Malek, his father, and two brothers were arrested at their home at approximately 4:00 a.m. A police officer indicated that Atteah had accused them of kidnaping his wife and children and, additionally, threatening to kill him. Malek responded that he had never threatened to kill Atteah, but conceded that his sister had fled the area. He falsely denied any knowledge of his sister's whereabouts. He was forced to promise to inform the authorities if he learned his sister's location and not to harm Atteah. Malek and his family were released at some point between 6:00 and 7:00 a.m.

Around noon, Malek left the house to purchase food. Once outside, he was forced into a taxi by men who were apparently lurking in wait for him, taken to a nearby police station, and searched. The police, led by the same officer as in the morning, confiscated his possessions and drove him to another location approximately an hour and a half distant. Again, the police officer demanded to know where Malek's sister was. When Malek protested his innocence, the police officers stripped off his clothes, tied his hands and legs, and hung him from a stick. The police officers then beat him with another stick, which was "very painful," and ultimately caused Malek to bleed and lose consciousness. Then, the police officers doused him with water and administered electrical shocks.

As a direct result of this abuse, Malek agreed to cooperate. At this point, his captors untied him and took him to another room, where an officer stated that he was "glad that [Malek was] able to remember what happened to [his] sister." Malek admitted helping his sister, with the aid of Father Raphael, escape to Jordan. He continued, however, to deny knowledge of her precise location. Although Malek was then taken to his home, he was instructed that "severe consequences" would occur if he told anyone about the incident. Fearing that the police officers would divulge his sisters' location to Atteah, Malek traveled to visit his sister

in Jordan,[2] at which point he accompanied her to Syria and helped her relocate to Lebanon. He was absent from Egypt for approximately one month.

Upon his return to Egypt, Malek relocated his residence to Cairo from Port Said, in order to avoid future confrontations with the police and Atteah. He also traveled to support his business. Because his business license was restricted to Port Said, however, Malek had to return there periodically to fill out paperwork and conduct essential transactions. In September 1993, due to continuing problems with Muslim fundamentalists, Malek and Maurice Malek dissolved their partnership. Thereafter, Malek continued to operate his business alone.

In 1998, Atteah attempted to intercept Malek at his place of business in Port Said. Atteah, accompanied by several other individuals, instructed Malek to leave Port Said and "the area." On another occasion, also while Malek was doing business in Port Said, he was attacked by a group of Muslims, including Mohamed Atwan and Sheik Abir. During this confrontation, one of his

---

[2]As the IJ recognized, it is unclear from the testimony precisely when Malek traveled to Jordan to help his sister relocate. Malek consistently testified that he only traveled to Jordan on one occasion; nevertheless, his testimony is self-contradictory and, in part, conflicted with his affidavit as to whether this trip occurred before or after the beating described above. Regardless, the IJ attributed the confusion to Malek's nervousness as a witness, rather than any duplicitous motive, and found any discrepancy to be immaterial.

assailants cut Malek's hand, requiring stitches.  Malek, however, did not report this incident to local authorities.

Acting on the advice and with the assistance of Father Raphael, Malek departed Egypt for Germany.  After approximately nineteen months, part of which he spent in the United States, he returned to Egypt, married Samaan, and attempted to resume his business operations.  Yet again, in January 2000, Atteah, accompanied by two other individuals, forced his way inside Malek's business office in Port Said.  Atteah threatened Malek, stating "this is the last day in your life." One of his associates accused Malek of being an infidel.  While Atteah and one of the men beat Malek, the other assailant began to break "everything" in the office.  A friendly neighbor helped Malek extract himself from the office and called the police, who arrived about twenty-five minutes later.  The police, however, refused to report the incident after learning that the alleged perpetrator was Atteah, a Muslim. Nonetheless, Malek was able to fill out a complaint at the district attorney's office.[3]  With Father Raphael's assistance, Malek and Samaan,[4] now pregnant, fled to Cairo and then to the United States.

---

[3]The complaint was later dismissed due to Malek's absence from the country.

[4]Apparently, Samaan spent time in both Cairo, where she was a student, and at Malek's family residence in Port Said.

## II.  ANALYSIS

We uphold factual determinations of the BIA if "supported by reasonable, substantial and probative evidence on the record considered as a whole."  Attia v. Gonzales, 477 F.3d 21, 23 (1st Cir. 2007) (per curiam) (quoting Carcamo-Recinos v. Ashcroft, 389 F.3d 253, 256 (1st Cir. 2004)).  "This so-called 'substantial evidence' standard applies to claims for asylum, withholding of removal, and relief under the CAT."  Sharari v. Gonzales, 407 F.3d 467, 473 (1st Cir. 2005) (citing Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004)).  Under this highly deferential standard, a determination will not be reversed unless "any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  "Merely identifying alternative findings that could be supported by substantial evidence is insufficient to supplant the BIA's findings."  Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003).  Rather, "the record must compel the contrary conclusion."  López de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007).  Conversely, we review de novo the legal conclusions of the BIA.  Wang v. Mukasey, 508 F.3d 80, 83-84 (1st Cir. 2007).  Where, as here, "the BIA adopts an IJ's decision, we review the relevant portion of the IJ's opinion as though it were the decision of the BIA."  Guillaume v. Gonzales, 504 F.3d 68, 72 (1st Cir. 2007).

-8-

The petitioner bears the burden of proof to establish eligibility for asylum. Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005). To meet this burden, a petitioner ordinarily must not only show that he subjectively fears future persecution, but also adduce credible and specific evidence that this fear is reasonable. Journal v. Keisler, 507 F.3d 9, 12 (1st Cir. 2007) (citation omitted). A petitioner may satisfy the subjective component through his own credible testimony. See Makhoul v. Ashcroft, 387 F.3d 75, 80-81 (1st Cir. 2004). To demonstrate that his subjective fear is objectively reasonable, a petitioner must present evidence showing either (1) that if returned he will be singled out for persecution; or (2) that there is a pattern or practice of persecuting a similarly situated group of persons on account of a protected ground in his country of origin. See Pieterson v. Ashcroft, 364 F.3d 38, 43-44 (1st Cir. 2004); accord 8 C.F.R. § 208.13(b)(2). Alternatively, a petitioner who demonstrates past persecution creates a rebuttable presumption that his fear of future persecution, if repatriated, is well-founded. See Tobon-Marin v. Mukasey, 512 F.3d 28, 31 (1st Cir. 2008); accord 8 C.F.R. § 208.13(b)(1).

## A. Asylum

Here, the IJ found that the harm inflicted upon Malek did not amount to persecution and, in any event, that such acts were not perpetrated on account of a protected ground. The Immigration

and Nationality Act does not define "persecution."  See Negeya v. Gonzales, 417 F.3d 79, 83 (1st Cir. 2005).  Thus, we have taken a case-by-case approach to determine whether the injuries suffered by a particular petitioner amount to persecution under the statute. Id.  In deciding whether specific facts arise to the level of persecution, relevant factors include the "severity, duration, and frequency of physical abuse."  Topalli v. Gonzales, 417 F.3d 128, 133 (1st Cir. 2005).  We have noted that "[t]o qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering."  Jorgji v. Mukasey, 514 F.3d 53, 57 (1st Cir. 2008) (internal quotation marks omitted) (quoting Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000)).  Additionally, a petitioner must show that the state participated in or at least acquiesced in the alleged acts of persecution.  Id.

We assume arguendo that Malek has experienced past persecution.  Even the IJ described the June 25 incident--which involved an abduction, severe restraint, beatings, a loss of consciousness, and electrical shocks, all at the hands of the police--as "torture."

Moreover, we note our skepticism regarding the IJ's conclusion that the alleged acts of persecution were exclusively attributable to Malek's decision to aid his sister's escape from Egypt, rather than his Christian faith.  On these facts, it seems that the assistance Malek rendered to his sister is inextricably

-10-

intertwined with Malek's religious beliefs and the pressures that were placed on Malek, Maurice Malek, Malek's sister and Atteah, who succumbed, to convert to Islam. If not for the underlying religious antagonism, the alleged persecution would never have taken place. We are doubtful that Malek's actions in support of his sister can be parsed so neatly from the underlying religious motivations of both Malek and his alleged persecutors. A petitioner need not show that persecution occurred or will occur solely on account of a protected ground. See 8 U.S.C. § 1158(b)(1)(B)(i) (requiring applicants for asylum to show that membership in a protected category "was or will be at least one central reason" for past or future persecution (emphasis added)); accord Vumi v. Gonzales, 502 F.3d 150, 159 (2d Cir. 2007) (explaining that, even where the petitioner was detained for a legitimate reason, an IJ should employ a mixed-motive analysis in light of the nature and severity of the interrogation). Here, where Malek was abducted from his home and subjected to what the IJ described as torture, it is questionable whether the police were motivated by legitimate law enforcement concerns, rather than the underlying religious conflict. See id. (recognizing the inherent difficulty of "determining whether harm was inflicted because of the applicant's acts or because of his beliefs underlying those acts" (internal quotation marks omitted) (quoting In re S-P-, 21 I.&N. Dec. 486, 498 (BIA 1996))).

Nevertheless, substantial evidence supports the IJ's determination that it would be reasonable for Malek to avoid future persecution by relocating away from Port Said. See Tendean v. Gonzales, 503 F.3d 8, 11 (1st Cir. 2007) (explaining that "the possibility of internal relocation negates any presumption of eligibility . . . based on past persecution"); accord 8 C.F.R. §§ 1208.13(b)(1)(i)(B), 1208.13(b)(3). The alleged acts of persecution detailed by Malek occurred exclusively in Port Said. In this case, the possibility of relocation is more than hypothetical--Malek actually did relocate to Cairo, where he was not disturbed by Atteah or anyone else. We acknowledge that Malek's relocation will entail some hardship,[5] as his business license is restricted to Port Said. Such a difficulty, however, was noted and rejected by the IJ, who explained that "there is no right under the asylum laws to engage in a particular business"; and that Malek did not show that he could not "provide[] for his family through another career in Cairo." In these circumstances, the IJ was not compelled to arrive at a different conclusion. See Tendean, 503 F.3d at 11 (applying substantial evidence standard to an IJ's findings concerning the reasonableness of relocation).

Similarly, the IJ did not err by concluding that Malek failed to establish a well-founded fear of future persecution. The

_____

[5]We likewise reject his contention, discussed more fully below, that he will be subjected to persecution in any location in Egypt.

IJ did not fully explain the basis for her decision; given that the IJ found Malek credible, we assume arguendo that she credited Malek's assertion that he fears persecution if returned to Egypt, thus satisfying the subjective component. Nevertheless, substantial evidence supports the IJ's implied determination that Malek lacked an objective basis for fearing future persecution in Egypt.

We are troubled by the IJ's failure to discuss the substantial documentary evidence regarding conditions in Egypt, which Malek claims provides an objective basis for his fear of future persecution. Coptic Christians clearly face considerable unpleasantness stemming from their religious beliefs. Moreover, the most recent State Department reports in evidence--the 2004 Country Report for Egypt and 2004 International Religious Freedom Report for Egypt--suggest that the Egyptian government, particularly at the local level, is not always responsive to the wrongs inflicted upon Coptic Christians by the Muslim majority. Indeed, the reports indicate that the local police may actually engage in and facilitate religious persecution to some extent. Finally, the reports reveal that certain of Egypt's laws appear to lack religious neutrality; to point to an example implicated by the instant facts, the minor children of a convert to Islam are automatically classified as Muslims as well, regardless of the religious persuasion of the spouse and children.

Nevertheless, "[w]hen considering whether the clarity of an administrative decision is sufficient to support our review . . ., we are not blind to the context in which the decision is made or oblivious of the record on which it is based." Xu v. Gonzales, 424 F.3d 45, 49 (1st Cir. 2005). In the hearings before the IJ, Malek relied almost exclusively on a theory of past persecution. When asked why he could not simply relocate to Cairo, he replied, "I don't know anything in Cairo and I don't have any business in Cairo. My business was based on the free trade zone of Port Said." Malek conceded that he was never harassed while in Cairo--he did not, as he does now in his brief, expound upon the sorry state of Coptic Christians throughout Egypt. Additionally, Malek did not even seek to introduce the most recent State Department reports into evidence--at the conclusion of the hearing, the IJ requested that one of the litigants provide her with the most recent reports. At that point, the government's attorney, not Malek, submitted the 2004 reports. Thus, it is unsurprising that the IJ did not focus on a nascent pattern or practice theory in considering whether Malek had a well-founded fear of persecution, given the issue's lack of prominence in the actual conduct of the proceedings, despite the voluminous record.

An IJ's duty to expound upon his or her reasons for rejecting a particular argument is concomitant with a litigant's actual articulation of that argument. Malek may have subjectively

-14-

feared renewed conflict with Atteah. This problem, however, could seemingly be avoided if Malek relocated within Egypt. Malek did not indicate that he is fearful of the general conditions within Egypt. Thus, there is a disconnect between Malek's subjective fear of persecution and the objective evidence of country conditions in Egypt. The IJ provided an extensive, individualized analysis of Malek's experiences with Atteah and the Muslim fundamentalists in Port Said; more was not required because Malek failed to urge a pattern or practice theory either through his testimony or the oral argument of counsel.[6]

Moreover, the IJ's opinion contains sufficient references to countrywide conditions to lead us to believe that she considered but rejected a pattern or practice theory. See Rotinsulu v. Mukasey, 515 F.3d 68, 72-73 (1st Cir. 2008) (explaining that an IJ's findings may be either implicit or explicit). The IJ held that "the harm inflicted on the respondent by his brother-in-law does not constitute persecution," in part, because such conditions

---

[6]We note that Malek did assert a pattern or practice theory before the BIA. Because we hold that the IJ did, if implicitly, reject Malek's evidence of country conditions, we need not determine the extent to which the BIA should have considered an argument developed largely on appeal. See Pinos-Gonzalez v. Mukasey, ___ F.3d ___, 2008 WL 583677, at *2-3 (8th Cir. Mar. 5, 2008)(enforcing procedural bar imposed by BIA where petitioner failed to first articulate an argument before the IJ); De la Cruz v. Mauer, 483 F.3d 1013, 1022-23 (10th Cir. 2007) (same). But see Zhong v. U.S. Dep't of Justice, 480 F.3d 104, 118-19 (2d Cir. 2007) (indicating exhaustion of issues, as opposed to claims for relief, to be an affirmative defense subject to waiver where not urged).

"[did] not exist on a countrywide basis." While the related discussion pertained to the specific threat posed by Atteah, the IJ clearly contemplated conditions throughout Egypt. Additionally, the IJ determined that requiring Malek to relocate within Egypt would not be "unreasonable," a conclusion that could only be justified if the IJ determined that Malek would not face persecution outside of Port Said. Indeed, we note that the IJ addressed the one explicit concern that Malek articulated concerning relocation within Egypt, dismissing the inconvenience that Malek might face given that his business license was restricted to Port Said. Finally, we cannot ignore the fact that the IJ, not Malek, requested <u>sua sponte</u> the submission of the 2004 State Department reports; it seems unlikely that, having specifically solicited the introduction of these documents, the IJ would have ignored them in rendering her decision. In these circumstances, we are satisfied that the IJ's decision contemplated country conditions throughout Egypt--"[w]e do not require an IJ to intone any magic words before we will review her determination." <u>Sulaiman</u> v. <u>Gonzales</u>, 429 F.3d 347, 351 (1st Cir. 2005).

In the past, we have noted that "[t]he obligation to explain and articulate depends importantly on the strength of the position being urged. Where no plausible reason is offered for a request, the word 'no' is plainly sufficient." <u>Karim</u> v. <u>Gonzales</u>, 424 F.3d 109, 111 (1st Cir. 2005). Moreover, in any context, a

-16-

litigant "cannot switch horses midstream in hopes of locating a swifter steed." United States v. Lilly, 13 F.3d 15, 18 (1st Cir. 1994) (citation omitted). Essentially, Malek now seeks relief based on an argument that he presented, if at all, in a threadbare, conclusory fashion before the IJ. We will not, on appeal, reverse the decision of the IJ for failing to make Malek's arguments for him.

**B. Withholding of Removal and Protection Under the CAT**

We likewise reject Malek's claims for withholding of removal and protection under the CAT. Because Malek has not satisfied the more lenient standard for asylum, a fortiori he cannot satisfy the higher burden for withholding of removal. Seqran v. Mukasey, 511 F.3d 1, 7 (1st Cir. 2007). Even if not waived, his claim for protection under the CAT fails on the merits. "An applicant claiming protection under the CAT bears the burden of establishing that 'it is more likely than not that he or she would be tortured if removed to the proposed country.'" Hana v. Gonzales, 503 F.3d 39, 44 (1st Cir. 2007) (quoting 8 C.F.R. § 1208.16(c)(2)). No record evidence supports the notion it is more likely than not that Malek would be tortured if returned to Egypt. While the IJ accepted Malek's testimony that he was tortured by the Egyptian government on a single occasion in 1991, no evidence suggests that he is likely to be tortured in the

future.  At the very least, the IJ's conclusion in this regard is supported by substantial evidence.

### III.  CONCLUSION

For the foregoing reasons, we <u>deny</u> Malek's petition for review.

<u>Affirmed</u>.