# United States Court of Appeals
## For the First Circuit

No. 23-1443

AMGAD SAMIR HALIM KHALIL,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Howard, and Rikelman,
Circuit Judges.

Saher J. Macarius, with whom Audrey Botros and Law Offices of
Saher J. Macarius LLC were on brief, for petitioner.

Yanal H. Yousef, Trial Attorney, Office of Immigration
Litigation, with whom Brian Boynton, Principal Deputy Assistant
Attorney General, Civil Division, and Anthony P. Nicastro,
Assistant Director, Office of Immigration Litigation, were on
brief, for respondent.

Julian Bava, with whom Adriana Lafaille, Sabrineh Ardalan,
Tiffany Lieu, American Civil Liberties Union Foundation of
Massachusetts, Inc., and Harvard Immigration & Refugee Clinical
Program, were on brief, for amici curiae.

March 29, 2024

**RIKELMAN, Circuit Judge**. Amgad Samir Halim Khalil is an Egyptian citizen and a Coptic Christian. After he acquired sensitive, personal information about the family affairs of a Muslim religious leader, he was beaten and subject to demands that he convert to Islam. Several months later, Khalil came to the United States and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") denied Khalil's asylum application, concluding that the attackers who beat him were motivated by his personal dispute with the imam, not Khalil's religion, and that other, separate experiences of harm did not amount to persecution. Under similar reasoning, the IJ also denied Khalil's withholding of removal claim. Finally, the IJ rejected Khalil's CAT claim. She held that Khalil had failed to establish that, if he returned to Egypt, the Egyptian government would more likely than not consent to or acquiesce in his torture by private actors. The Board of Immigration Appeals ("BIA") affirmed. Khalil now petitions this court for review, challenging the denial of his claims.

We grant the petition for review in part, vacate the decision of the BIA as to Khalil's asylum claim premised on mixed-motive persecution and as to his CAT claim, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Relevant Facts[1]

Khalil was born and lived most of his life in Minya, Egypt, where he attended a Coptic Christian church each week. Because of gold jewelry that he wears and two visible tattoos of a cross on his hand, Khalil was recognizable to others in his community as a Coptic Christian. For many years before he left for the United States in 2016, Khalil worked in a hospital as a medical laboratory technician, where his duties included drawing blood from patients.

Khalil's asylum claim is premised largely on two, interconnected incidents that occurred while he was working in the hospital lab. One evening in early May 2016, an imam came to the lab to request bloodwork for his unmarried, fourteen-year-old daughter. The bloodwork revealed that the imam's daughter was pregnant. When Khalil informed the imam of the results, the imam became irate and demanded that Khalil change or destroy the results, which Khalil refused to do.

About one week later, a different female patient visited Khalil's lab requesting bloodwork and a "vaginal sample." After Khalil drew the patient's blood, he told her to sit behind a

_____

[1] "We draw the facts from the administrative record, including [Khalil's] testimony before the IJ." Caz v. Garland, 84 F.4th 22, 25 n.2 (1st Cir. 2023).

curtain in the room, change, and wait for a nurse to come in to collect the sample. The patient started to undress in front of Khalil and accused Khalil of sexually harassing her.

When Khalil opened the door to leave the room, he found four men standing in the hallway armed with sticks; based on their clothing, he identified them as members of the Muslim Brotherhood. The men stated that they were the brothers of the female patient Khalil allegedly sexually harassed and that they were there to defend her. They called Khalil an infidel, and they demanded that he convert to Islam or marry their sister if he ever wanted to leave. When Khalil refused to do so, the men "got so angry" that they "almost br[oke] [his] arm." They again demanded that Khalil convert, and when he again refused, they beat him. The violence quickly escalated. Each time Khalil refused to renounce his religion, the men grew angrier and intensified their attack, eventually punching Khalil's face, kicking his stomach, and beating him with sticks. When they finally stopped, the attackers told Khalil that he "should have list[en]ed to the imam and changed the results [of the blood test] for his daughter."

Khalil was treated at the hospital for the injuries he sustained during the attack. Because of the beating, he requested a one-year leave of absence from the hospital, which was approved. Around May 20, 2016, a week and a half after the incident, Khalil moved with his wife and three sons from Minya to Giza, a different

area of Egypt, where some of his extended family lives.

Khalil resided in Giza for about two-and-a-half months. During that time, he received a phone call from a friend who had accompanied him to receive medical treatment after the beating. This friend told Khalil that his attackers were looking for him at Khalil's lab and that they threatened to kill Khalil if they ever found him unless he converted. Soon thereafter, Khalil left Egypt. He entered the United States on August 24, 2016, on a tourist visa.

## B. Legal Proceedings

In December 2016, while his visa was still valid, Khalil applied for asylum, withholding of removal, and protection under the CAT. After an interview with an asylum officer, his asylum application was denied, and he was referred for removal proceedings. In January 2018, the United States Department of Homeland Security served Khalil with a notice to appear alleging that he had overstayed his visa and charging him as removable under the Immigration and Nationality Act ("INA"). Khalil conceded removability and renewed his prior application. His principal claims were that he had been persecuted on account of his Coptic Christian religion and that he would be tortured if forced to return to Egypt.

At his merits hearing before the IJ, the government cross-examined Khalil about his encounter with the imam and the

subsequent beating.[2]  Khalil testified that, in addition to the beating, he had been harmed due to his faith when individuals threw rocks and cursed at him while he was on his way to work or church. Along with his testimony, Khalil offered supporting documents for the IJ's consideration, including the declaration attached to his asylum application and a transcript of his asylum interview, in which he recounted many of the facts detailed above.

The IJ explicitly declined to make a credibility finding, although she noted that parts of Khalil's story seemed implausible and that there were some inconsistencies between his testimony, declaration, and asylum interview.  Nevertheless, the IJ "assum[ed] that the events played out exactly as [Khalil] described" and that the beating at the hospital rose to the level of persecution.  She denied Khalil's asylum application, however, on the ground that he had not established a nexus between the harm he suffered and a protected ground.  The men attacked Khalil "because he did not listen to the [i]mam and would not destroy the [blood] test results," the IJ concluded.  In her view, "[i]f [Khalil's] religion played any role in this attack[,] it was minor at best and clearly was not 'at least one central reason' for the persecution."  The IJ therefore denied Khalil's asylum claim to

---

[2] Under an agreement between the parties, Khalil was first cross-examined by the government and then only briefly questioned by his own attorney.

the extent it was premised on the interaction with the imam and the subsequent beating. As to the incidents of verbal harassment and rock-throwing, the IJ presumed that those past events occurred because of Khalil's religion but concluded that they did not amount to persecution.

The IJ then addressed Khalil's remaining claims. She concluded that because Khalil had not shown he was entitled to asylum, he necessarily could not meet the higher burden of proof required for withholding of removal. Turning to his CAT claim, the IJ denied relief because she determined that Khalil failed to show it was more likely than not that he would be tortured with the consent or acquiescence of the Egyptian government if he returned to Egypt.

Khalil appealed to the BIA, which affirmed the IJ's ruling.[3] Specifically, the BIA agreed with the IJ's determination that Khalil had not shown that he was beaten because of his religion. In affirming the IJ's nexus conclusion, it held that Khalil failed to meet his burden to demonstrate that his religion "played any more than an incidental role in motivating the men to attack him." The BIA also agreed that the incidents of verbal

---

[3] Because the IJ did not explicitly make an adverse credibility finding, Khalil had a rebuttable presumption of credibility on appeal before the BIA. 8 U.S.C. § 1158(b)(1)(B)(iii). In reaching its decision, the BIA neither expressly stated nor implied that the presumption had been rebutted.

harassment and rock-throwing were not sufficiently extreme to constitute persecution. Like the IJ, it then reasoned that Khalil's inability to satisfy the lower burden of proof for asylum foreclosed his withholding of removal claim. Lastly, it held that the IJ's findings underpinning the denial of CAT protection were not clearly erroneous. The BIA therefore dismissed the appeal. Khalil timely petitioned this court for review.

## II. STANDARD OF REVIEW

In immigration cases, our review "typically focuses on the final decision of the BIA." Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020). But "to the extent that the BIA deferred to or adopted the IJ's reasoning, we review those portions of the IJ's decision" as well. Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022). We apply de novo review to the BIA's legal conclusions with "some deference to [the BIA's] interpretations of statutes and regulations related to immigration matters." Aldana-Ramos v. Holder, 757 F.3d 9, 14 (1st Cir. 2014). We apply the substantial evidence standard to factual findings, meaning that we will disturb such findings only if "in reviewing the record as a whole, 'any reasonable adjudicator would be compelled to conclude to the contrary.'" Barnica-Lopez v. Garland, 59 F.4th 520, 527 (1st Cir. 2023) (quoting Gómez-Medina v. Barr, 975 F.3d 27, 31 (1st Cir. 2020)). When we discuss the BIA and IJ's decisions as a unit, we

refer to the BIA and IJ as "the agency." See Pineda-Maldonado v. Garland, 91 F.4th 76, 80 (1st Cir. 2024).

## III. DISCUSSION

Khalil raises multiple issues in his petition, but we need address only some to resolve this case. We first examine Khalil's asylum claim. Khalil argues that the agency legally erred because it did not meaningfully consider whether his religion was intertwined with his personal dispute with the imam such that both were central reasons for his beating by the Muslim Brotherhood. In addition, he contends that the factual record compels the conclusion that his beating was on account of his religion and that the verbal harassment and rock-throwing he experienced were sufficiently serious to constitute past persecution. We conclude that the agency did not legally err in the nexus analysis, but we agree that the record compels the conclusion that religion was one central reason for Khalil's beating. Regarding the incidents of verbal harassment and rock-throwing, however, substantial evidence supports the agency's determination that such mistreatment was not sufficiently severe to rise to the level of persecution. We then turn to Khalil's CAT claim and conclude that the BIA erred when it failed to review the IJ's legal conclusions de novo.

### A. Asylum Claim

We begin with the legal framework that governs Khalil's asylum claim before turning to the issues raised in his petition.

- 10 -

To be eligible for asylum, Khalil bears the burden of showing that he is a "refugee" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(B)(i). A refugee is an individual who is "unable or unwilling" to return to their home country because of "persecution or a well-founded fear of persecution" that is "on account of" their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To satisfy the "on account of" test, commonly referred to as the nexus requirement, "the protected ground need not be the only reason for the harm the applicant suffered, but it must be 'at least one central reason for [the] persecuti[on].'" Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023) (alterations in original) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

### 1. Past Persecution Based on Mixed Motives

The "one central reason" test does "not require an asylum applicant to demonstrate that [they were] singled out only due to [their] protected trait." Barnica-Lopez, 59 F.4th at 531 (quoting Enamorado-Rodriguez v. Barr, 941 F.3d 589, 596 (1st Cir. 2019)). Instead, the test "contemplates the possibility that multiple motivations can exist." Aldana-Ramos, 757 F.3d at 18-19. For instance, we have held that an applicant suffers persecution on account of a protected ground when it is "impossible to disentangle" a non-protected motive and the protected ground. Pineda-Maldonado, 91 F.4th at 89 (finding that the applicant

- 11 -

established the requisite nexus when a pecuniary motive and the applicant's particular social group were "two sides of the same coin" (quoting Perez-Sanchez v. U.S. Att'y Gen., 935 F.3d 1148, 1158 (11th Cir. 2019))); see also Malek v. Mukasey, 274 F. App'x 1, 5 (1st Cir. 2008) (recognizing that a non-protected ground can be "inextricably intertwined with [the applicant's] religious beliefs and the pressures that were placed on [them] . . . to convert"). Therefore, an asylum applicant can still be eligible for relief "even if one reason -- perhaps even the primary reason -- for the persecution is not a basis for asylum." Espinoza-Ochoa, 89 F.4th at 235.

This same standard applies to personal disputes. We have explained that "[e]vents that stem from personal disputes are generally not enough to show the required nexus" between past harm and a protected ground. Sompotan v. Mukasey, 533 F.3d 63, 71 (1st Cir. 2008) (citations omitted). At the same time, we have recognized that even if a personal dispute "'partially motivate[s]' a persecutor's mistreatment of an applicant, record evidence can nonetheless indicate that the applicant's [protected status] may be 'another central reason for the persecution.'" Espinoza-Ochoa, 89 F.4th at 237 (first alteration in original) (quoting Madrigal v. Holder, 716 F.3d 499, 506 (9th Cir. 2013)); see also Pineda-Maldonado, 91 F.4th at 89; Aldana-Ramos, 757 F.3d at 19 n.8.

Accordingly, "to prevail on a mixed-motive theory, [Khalil] 'need not prove that a protected ground was the most important reason'" that his attackers beat him. Espinoza-Ochoa, 89 F.4th at 235 (quoting Enamorado-Rodriguez, 941 F.3d at 596). Rather, he "must show only that [his religion] was not 'incidental, tangential, superficial, or subordinate to another reason for [the] harm.'" Id. (second alteration in original) (quoting Barnica-Lopez, 59 F.4th at 531).

Khalil and amici contend that the agency erred as a matter of law when it conducted the "at least one central reason" analysis. They assert that the agency failed to apply properly the mixed-motive nexus standard because it presumed that the presence of a retributory motive for persecution signaled the absence of a religious motive.[4]

We conclude that the agency did not preclude the possibility of mixed-motive persecution or incorrectly apply the mixed-motive standard in examining the nexus between Khalil's religion and the harm he suffered. We have held that the BIA errs as a matter of law when it fails to consider whether a statutorily

_____

[4] Although Khalil states on appeal that he is entitled to asylum based on his religion, political opinion, and particular social group, we limit our asylum analysis solely to religion, as that was the only protected ground that the agency addressed. See James v. Garland, 16 F.4th 320, 321 n.1 (1st Cir. 2021)(explaining that "our review is limited to the grounds the [agency] offered for its decision").

protected ground was a central reason for the petitioner's persecution, even if the petitioner also was targeted for other, non-protected grounds. See, e.g., Enamorado-Rodriguez, 941 F.3d at 596; Aldana-Ramos, 757 F.3d at 14. But neither the IJ's nor the BIA's opinion suggests that occurred here. Rather, the opinions demonstrate that the agency "acknowledged the possibility of a mixed-motive case, but based on the evidence presented, made a fact-specific determination that [Khalil] had not shown that the persecution was motivated by [his religion]." Barnica-Lopez, 59 F.4th at 529-30 (quoting Villalta-Martinez v. Sessions, 882 F.3d 20, 24 (1st Cir. 2018)).

For instance, the IJ and BIA each acknowledged that multiple motives could exist and that Khalil's religion could have played some role in the beating. But the IJ determined as a factual matter that religion played only an incidental role, and the BIA agreed. Specifically, the IJ held that "[i]f [Khalil's] religion played any role in [his] attack[,] it was minor at best and clearly was not 'at least one central reason' for the persecution." Similarly, the BIA acknowledged the attackers' demands that Khalil convert but agreed with the IJ that Khalil had not met his burden to demonstrate that "religion played any more than an incidental role in motivating" the beating, applying the correct legal standard.

To be sure, it is not enough for the agency simply to

- 14 -

invoke the "one central reason" standard in its nexus analysis while simultaneously reasoning that the persecution cannot be motivated by a protected ground simply because a non-protected ground for the persecution also exists. See Enamorado-Rodriguez, 941 F.3d at 596; Aldana-Ramos, 757 F.3d at 14. In other words, the agency cannot conclude that there are no mixed motives simply by identifying one motive. And "[e]ven on its own terms," the agency's conclusion that Khalil's persecutors were motivated by his refusal to destroy the blood test results "does not itself exclude" the possibility that they were also motivated by Khalil's religion. Enamorado-Rodriguez, 941 F.3d at 597. But the agency did not "prematurely terminate the analysis upon the finding of another motive," Sompotan, 533 F.3d at 70, or find that Khalil "posit[ed] a plausible alternative motive to the one found by the [IJ]" but nevertheless reason that motive could not co-exist with an unprotected one, Enamorado-Rodriguez, 941 F.3d at 595. It went on to determine that the evidence here was insufficient to establish a nexus between the beating and Khalil's faith. In sum, the opinions below do not suggest that the agency spurned the possibility of mixed motives. See Barnica-Lopez, 59 F.4th at 529-30; Villalta-Martinez, 882 F.3d at 24.

We turn, then, to Khalil's argument that the factual record compels the conclusion that religion was at least one central reason for his beating. We review the factual finding

- 15 -

against Khalil on this issue under the substantial evidence standard. Pineda-Maldonado, 91 F.4th at 87.

Here, a reasonable adjudicator would be compelled to conclude that Khalil's religion qualifies as a central reason for the beating. Khalil's attackers demanded he convert, beat him when he refused to do so, demanded again that he convert, and beat him more intensely when he again refused. The attackers' own statements show that, regardless of whatever else prompted the beating, Khalil would not have been harmed had he agreed to convert. See Sanchez-Vasquez v. Garland, 994 F.3d 40, 47 (1st Cir. 2021) (deeming perpetrators' statements essential to the nexus determination); Ivanov v. Holder, 736 F.3d 5, 14-15 (1st Cir. 2013) (determining persecutors were driven by a religious motive that they "recognized and gave voice to" during their attack of the applicant); Singh v. Mukasey, 543 F.3d 1, 7 (1st Cir. 2008) (explaining that perpetrators' statements "are a crucial factor" for determining the central reason for harm); cf. Esteban-Garcia v. Garland, 94 F.4th 186, 194 (1st Cir. 2024) (finding no nexus because persecutors "didn't say anything" about the applicant's protected ground).

The attackers' demands that Khalil convert to another faith and their increased violence in response to his refusal to do so make this case unlike Sompotan v. Mukasey, 533 F.3d 63 (1st Cir. 2008), which the IJ relied on in finding that the beating was

- 16 -

the result of a personal dispute only. In Sompotan, we held that the record did not compel the conclusion that those who robbed the petitioners and their restaurant while yelling "Chinese bastard, crazy Christian, crazy Chinese" were motivated by religious and racial animus rather than by a desire to rob because "[t]he fact that [robbers] would stoop to the level of using racial slurs is, unfortunately, not surprising." 533 F.3d at 70. By contrast, the attackers here did not make just a passing reference to Khalil's religion. Rather, they made religious demands on him during the attack and beat him more vigorously when he refused to cede to those demands.

The arguments the government offers as to why substantial evidence supports the agency's no-nexus determination do not alter our conclusion. The government emphasizes that Khalil recounted his attackers' demands that he convert only in his asylum interview and written declaration attached to his asylum application, but not in his testimony before the IJ. But in evaluating whether substantial evidence supports the agency's conclusion, we are tasked with reviewing "the record as a whole." Barnica-Lopez, 59 F.4th at 527. Further, at his hearing, Khalil described the beating exclusively during the government's cross-examination, and the government strategically asked him only one question about what his attackers said during the beating: Did they reference the blood test results? The framing of the

- 17 -

government's questions on cross-examination does not change our assessment of the record as a whole. The government also contends that, because Khalil testified that the imam had no issue with him until the imam found out about the blood test results, religion did not motivate the attack. But that argument ignores the attackers' own words and actions.

For all these reasons, we find that the record compels the conclusion that Khalil's religion played more than an incidental role in his beating. We therefore grant the petition for review as to Khalil's asylum claim premised on mixed-motive persecution.[5]

---

[5] We acknowledge that our nexus analysis has no bearing on whether the beating itself meets the required "threshold[s] of seriousness" and "regularity" to qualify as persecution, Hernandez-Martinez v. Garland, 59 F.4th 33, 38 (1st Cir. 2023) (quoting Ivanov, 736 F.3d at 11), which remains a factual determination for the agency to make on remand because the IJ only "assum[ed]" the beating amounted to persecution and the BIA affirmed on nexus grounds. If the agency determines that the beating did rise to the level of persecution, Khalil's resultant showing of past persecution entitles him to a presumption of a well-founded fear of persecution. That presumption may be rebutted only if the government shows by a preponderance of the evidence that (1) "there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," or (2) the applicant could avoid future persecution by safely internally relocating and, "under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(1)(i). Below, the IJ held in the alternative that, even if Khalil had established past persecution on account of a protected ground, "the record indicate[d] that Khalil had safely relocated within the country before leaving for the United States." But "it is not clear from the BIA's opinion whether it adopted that [alternative] ground provided by the IJ." Chavez, 51 F.4th

## 2. Other Incidents of Past Harm

We reach a different conclusion as to Khalil's past persecution claim based on incidents of verbal harassment and rock-throwing.

As Khalil points out, the IJ inaccurately described the record evidence in concluding that such mistreatment was not sufficiently severe to constitute past persecution, and the BIA did not correct the IJ. Specifically, the IJ stated that Khalil "testified that he was never physically harmed" by the incidents of verbal harassment and rock-throwing. But Khalil testified that he had in fact been harmed. At his merits hearing, he confirmed that he had sought medical treatment at the hospital where he worked for injuries from the rock-throwing.[6]

at 433. And "[w]hen the BIA does not consider an IJ's alternative ground for denying relief, that ground is not before us." Id. (quoting Bonilla v. Mukasey, 539 F.3d 72, 81-82 (1st Cir. 2008)).

As for Khalil's withholding of removal claim, the BIA denied that claim solely on the ground that he failed to show he was entitled to asylum. If the BIA concludes on remand that Khalil has a well-founded fear of future persecution, it should consider the withholding of removal claim in light of that conclusion.

[6] Khalil also notes that the IJ stated that "having rocks thrown in one's general direction does not rise to the level of persecution," even though he testified that the rocks were aimed at him specifically. But earlier in the same paragraph of her decision, the IJ did accurately recount this evidence. She explained that Khalil testified that "[w]hile living in Egypt, he was constantly exposed to people . . . throwing rocks at him because of his religion." The IJ's accurate description mitigates the concern that she failed to understand that aspect of Khalil's testimony.

The BIA did not recognize any mischaracterization of the record by the IJ. Rather, it stated only that on de novo review it "affirm[ed] the [IJ's] determination that the verbal harassment and incidents of rock[-]throwing experienced by [Khalil] [were] not sufficiently extreme to amount to persecution."

Ultimately, however, we agree with the government that substantial evidence supports the BIA's conclusion that the mistreatment Khalil described was insufficient to qualify as past persecution.[7] "Persecution" is not defined by statute, and "what constitutes persecution is resolved on a case-by-case basis." Panoto v. Holder, 770 F.3d 43, 46 (1st Cir. 2014). "Generally, it involves a discriminatory harm . . . that 'surpasses unpleasantness, harassment, and even basic suffering.'" Yong Gao v. Barr, 950 F.3d 147, 152 (1st Cir. 2020) (quoting Panoto, 770 F.3d at 46). To constitute persecution, the discriminatory experiences "must have reached a fairly high threshold of seriousness, as well as [occurred with] some regularity and

_____

[7] We have in the past noted the "tension between the standards of review applied to past persecution by the BIA and circuit courts," explaining that the BIA characterizes the ultimate determination of whether a given set of facts amounts to persecution as a legal question that it reviews de novo whereas we review this same determination under the substantial evidence standard reserved for factual findings. Aguilar-Escoto v. Garland, 59 F.4th 510, 519 (1st Cir. 2023). As in Aguilar-Escoto, neither party raises this tension and the case does not require us to address it, so we again "leave this issue to another day." Id. at 520.

frequency." Martínez-Pérez v. Sessions, 897 F.3d 33, 39-40 (1st Cir. 2018) (alteration in original) (quoting Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006)). Factors relevant to this determination therefore include: "[t]he severity, duration, and frequency" of the harm, "whether harm is systematic rather than reflective of a series of isolated incidents," the nature and extent of the applicant's injuries, and whether the applicant had to seek medical attention for their injuries. Thapaliya v. Holder, 750 F.3d 56, 59 (1st Cir. 2014) (internal quotation marks and citations omitted); Martínez-Pérez, 897 F.3d at 40; Topalli v. Gonzales, 417 F.3d 128, 133 (1st Cir. 2005).

Considering the incidents as Khalil described them, we are not compelled to conclude that they rose to the level of persecution. Khalil testified that, from the ages of twenty to thirty, he "constantly" had rocks thrown at him when he was going to church, and people cursed at him "a lot" on his way to church and work. He did not describe any specific incidents. As noted, he did seek medical attention for injuries he sustained. But the record contains no information on the nature and extent of his injuries, the severity of the harm, or whether the harm was systematic. Accordingly, even if the IJ inaccurately described part of Khalil's testimony and the BIA did not correct the error, substantial evidence supports the conclusion that Khalil did not suffer past persecution as a result of the verbal harassment and

rock-throwing.

## B. CAT Claim

Next, we turn to Khalil's challenge to the denial of his CAT claim. We address one initial matter before describing the governing legal framework and turning to the substance of Khalil's petition.

Khalil premised his CAT claim on two threats: (1) the likelihood that he would be tortured because of the incidents with the imam and Muslim Brotherhood and (2) the likelihood that he would be tortured because he is a Coptic Christian. We agree with the government that Khalil has waived any challenge based on the first portion of his claim by failing to raise it in his opening brief, so we focus only on the second portion of his claim. See Ouk v. Keisler, 505 F.3d 63, 66 n.3 (1st Cir. 2007) (explaining that issues not raised in an appellant's opening brief are waived).

To establish eligibility for CAT protection, Khalil must show that "it is more likely than not that he will be tortured if returned to his home country." Bonnet v. Garland, 20 F.4th 80, 84 (1st Cir. 2021) (quoting Mazariegos v. Lynch, 790 F.3d 280, 287 (1st Cir. 2015)); see 8 C.F.R. § 208.16(c)(2). In contrast to asylum, Khalil may obtain CAT relief even if the risk of torture he faces is not on account of any protected ground. Chavez, 51 F.4th at 435 (citing Rashad v. Mukasey, 554 F.3d 1, 6 (1st Cir. 2009)). Torture involves, among other things, "an act causing

- 22 -

severe physical or mental pain or suffering . . . by or at the instigation of or with the consent or acquiescence of a public official." Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004); see 8 C.F.R. § 208.18(a)(1).

Khalil's arguments focus on the acquiescence standard, which requires that a public official, "prior to the activity constituting torture, have awareness of [the torture] and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). We have explained that this regulation "anticipates a two-part, successive inquiry": (1) "the likelihood of a foreign government's awareness of torture," and (2) "a likely breach of the government's duty to intervene to prevent the torture." H.H. v. Garland, 52 F.4th 8, 19-20 (1st Cir. 2022). Awareness includes not just actual knowledge of the torture but also willful blindness to it. Id.

Khalil contends that when the BIA affirmed the IJ's ruling that he failed to show that the Egyptian government would acquiesce in his torture if he returned to Egypt, it applied the wrong standard of review. He states that the BIA was required to review de novo the IJ's legal determination that any harm he would suffer if he returned to Egypt would not satisfy the regulatory definition of torture, but the BIA instead used a clearly erroneous standard. For our part, we review de novo the question of whether the BIA applied the correct standard of review. See Adeyanju v.

- 23 -

Garland, 27 F.4th 25, 38-39 (1st Cir. 2022).

"An IJ's determination regarding CAT relief is reviewed as a mixed question of law and fact." H.H., 52 F.4th at 16. "[W]hether a person is likely to suffer a particular harm and the role of the foreign government in causing or allowing that harm" are factual findings that the BIA reviews for clear error, but "whether such harm rises to the level of torture and whether the government's role renders the harm 'by or at the instigation of or with the consent or acquiescence of a public official'" are legal questions it reviews de novo. DeCarvalho v. Garland, 18 F.4th 66, 73 (1st Cir. 2021) (citation omitted). Framed more specifically in terms of acquiescence: "[H]ow [a public official] would likely act in response to the harm the applicant fears" is a factual question, but "whether this response establishes that a public official was 'aware of [the torturous] activity' and subsequently breach[ed] his or her 'legal responsibility to intervene to prevent such activity'" is a question of law. Myrie v. Att'y Gen., 855 F.3d 509, 517 (3d Cir. 2017) (cleaned up) (quoting 8 C.F.R. § 1208.18(a)(7)).

Here, the BIA's opinion does not indicate that it reviewed de novo the IJ's legal conclusion that the Egyptian government's likely actions would not amount to acquiescence. The BIA stated that Khalil did not "meet his burden to establish" that the Egyptian government would more likely than not acquiesce in

- 24 -

the torture he fears. But its sole support for that conclusion was its statement that "[t]he [IJ's] findings regarding the likelihood that a public official would torture or acquiesce to the torture of [Khalil] are not clearly erroneous, given the government's efforts to protect Coptic Christians and suppress religious fundamentalists in the Muslim Brotherhood and other organizations designated as terrorist groups." The opinion thus suggests that the BIA erroneously treated the issue of whether the government would acquiesce in Khalil's torture as a factual finding subject only to clear error review. See H.H., 52 F.4th at 19. Importantly, the BIA discussed the legal issue of government acquiescence in the same breath as the IJ's factual findings. Its use of the "clearly erroneous" language also suggests that it blended the factual question of the Egyptian government's likely behavior with the legal question of whether that behavior shows awareness and breach of a legal duty. But those inquiries are distinct. See id.; Murillo Morocho v. Garland, 80 F.4th 61, 69 (1st Cir. 2023). Further, unlike in other sections of its decision when the BIA expressly stated it applied de novo review, the BIA did not do so in its discussion of Khalil's CAT claim.

The government does not contend that the BIA applied de novo review on the legal issue or that it was not required to do so. Rather, it says that the BIA's "review of the factual findings and the evidence underpinning them under the clear error standard

was proper." But that simply ignores Khalil's arguments about the standard of review on the legal issue.

To be sure, we have concluded that the BIA used the proper standard of review even if it did not "expressly specify" which standard it applied when it "call[ed] the IJ's determination 'correct' and 'cite[d] legal authority for its conclusion.'" DeCarvalho, 18 F.4th at 74 (quoting Samayoa Cabrera v. Barr, 939 F.3d 379, 383 (1st Cir. 2019)). But in those cases, the BIA either explicitly stated the clearly erroneous standard applied only to the IJ's factual findings about the applicant's likely treatment, or it adhered to the distinction between its review of factual findings and its review of legal issues. See Samayoa Cabrera, 939 F.3d at 382-83; DeCarvalho, 18 F.4th at 73-74.

By contrast, we have remanded when the BIA's opinion suggests that the BIA extended the clearly erroneous standard to the issue of whether the government's likely actions would qualify as acquiescence in torture as a matter of law. See H.H., 52 F.4th at 19 (finding that the BIA did not apply the correct standard of review when it found no "clear error in the specific finding that the potential harm [the applicant would experience] would not be with any consent or acquiescence of the Honduran government" (emphasis omitted)); cf. Myrie, 855 F.3d at 517 (vacating and remanding when the BIA stated that it found "no clear error in the Immigration Judge's finding that the government of Panama would

not be acquiescent to any torture" because the BIA "should have determined de novo whether [the factual] findings were sufficient to establish acquiescence").  That is the case here.

Further, we cannot discern from the opinions below that either the IJ or the BIA applied the proper legal test on the acquiescence question, which makes us particularly reluctant to conclude that the BIA did indeed "complet[e] its own assessment of whether the documentary evidence" satisfied the regulatory definition of torture.  Aguilar-Escoto, 59 F.4th at 518.  The BIA and IJ cited the correct legal test, as they explained that acquiescence requires either actual knowledge or willful blindness and a breach of legal responsibility.  And the IJ made various findings about the government's response to instances of deadly violence against Coptic Christians by religious extremists.  But the opinions do not indicate that the BIA or IJ "evaluated the effectiveness of those steps and whether they met the government's duty to intervene."  Murillo Morocho, 80 F.4th at 68.  And, "[n]either the IJ's nor the BIA's decision addressed what 'legal duty' [Egyptian] authorities had in this situation and whether the government's efforts satisfied it."  Id. (finding that those omissions made us unable to determine "whether the agency's analysis reflect[ed] reasoned consideration" of the applicant's CAT claim and remanding for the BIA to reconsider the acquiescence question using the correct legal standard).

Additionally, we have "expressed skepticism that 'any record evidence of efforts' to prevent torture will 'necessarily' meet the duty to intervene." Id. at 69 (quoting H.H., 52 F.4th at 21). That is because lower-level officials may still consent to or acquiesce in torture notwithstanding higher-level officials' attempt to address some violence. H.H., 52 F.4th at 21 (citing De La Rosa v. Holder, 598 F.3d 103, 110-11 (2d Cir. 2010)). In other words, "the fact that some officials take action to prevent the torture" is "neither inconsistent with a finding of government acquiescence nor necessarily responsive to the question of whether torture would be 'inflicted . . . with the consent or acquiescence of a public official.'" De La Rosa, 598 F.3d at 110 (citation omitted).

Here, to the extent the IJ did consider whether the Egyptian government's actions reflected willful blindness or a breach of the duty to intervene, she relied heavily on the actions of high-level officials: the Egyptian president's pledge to fight terrorism after a particular attack, the president's alliance with the Coptic Christian church, which "has offered Christians in Egypt a measure [of] protection," and the fact that the Egyptian government has formally designated the Muslim Brotherhood a terrorist organization. The IJ also determined that the evidence about the president's pledge "directly contradict[ed]" Khalil's expert report, which stated that police inaction was a significant

problem for Coptic Christians.  But, as we have explained, one high-level official's formal pledge in response to a particular incident may be fully consistent with other officials' complicity.

The BIA reproduced the IJ's reasoning.  In finding no clear error in the IJ's findings, it referred only to (1) the fact that the Egyptian government has designated the Muslim Brotherhood a terrorist organization, which says little about whether public officials would nevertheless acquiesce in torture of Coptic Christians, and (2) "the government's efforts [to] protect Coptic Christians and suppress religious fundamentalists," without specifying those efforts, discussing whether they satisfy the legal duty to intervene, or remarking upon their effectiveness.

We note that Khalil bears the burden to prove his entitlement to protection under the CAT.  We also recognize that the country conditions evidence in this case before the IJ was limited.[8]  Further, the BIA need not "expressly parse or refute on the record" every one of the applicant's arguments when it "has given reasoned consideration to the petition, and made adequate findings."  H.H., 52 F.4th at 23 (quoting Wei Guang Wang v. BIA, 437 F.3d 270, 275 (2d Cir. 2006)).  But here, because the BIA's brief analysis does not indicate it applied the correct legal test or standard of review, we cannot determine that it gave reasoned

---

[8] As a result, the IJ took administrative notice of two U.S. State Department human rights reports on Egypt.

- 29 -

consideration to Khalil's CAT claim. Cf. Murillo Morocho, 80 F.4th at 68; Myrie, 855 F.3d at 517 (remanding when, although it was "possible that the BIA considered the appropriate . . . standard" before concluding that the facts were insufficient to establish acquiescence, the court "[could not] tell from the BIA's short decision whether this is indeed the case").

On remand, the BIA should evaluate the consent or acquiescence question de novo and under the proper legal test.

## IV. CONCLUSION

For all these reasons, we grant the petition in part, vacate the agency's decision insofar as it denied Khalil's asylum claim premised on mixed-motive persecution and denied his CAT claim, and remand for further proceedings consistent with this opinion.